No. 85-268

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

RICHARD DUANE JOHNSON,

        Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Stewart A. Pearce, II, Missoula, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Joe R. Roberts, Asst. Atty. General, Helena
Robert Deschamps, III, County Attorney, Missoula,
Montana; Betty Wing, Deputy County Attorney

---

Submitted on Briefs: May 1, 1986

Decided: June 6, 1986

Filed: **JUN 6 - 1986**

_Ethel M. Harrison_
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Richard Duane Johnson (defendant) appeals the jury verdict and April 30, 1985, judgment of the Fourth Judicial District Court, County of Missoula, finding defendant guilty of driving or being in actual physical control of a motor vehicle upon the public ways of Montana while under the influence of alcohol. Johnson also appeals the sentence imposed. We affirm.

Defendant was found by a Missoula County Deputy Sheriff, Officer Peterson, at approximately 1:40 a.m., December 8, 1983, in a disabled car on Interstate 90 near East Missoula. Officer Peterson, while discussing the predicament with defendant, noted that defendant appeared to be intoxicated. Officer Peterson requested that defendant perform several field sobriety tests. Defendant either refused or was unable to perform each test. Defendant was then arrested.

Thereafter, Officer Peterson took defendant to the patrol car and told defendant that he would be tape recording defendant's statements. After obtaining defendant's name, Officer Peterson advised defendant of his Miranda rights. Defendant acknowledged that he understood those rights, then asked if he had the right to "address somebody." The following conversation ensued:

> MR. JOHNSON: Yes I understand. Do I have the right to address somebody?
>
> DEPUTY PETERSON: Yeah. In just a second, okay. I have got a tape recorder on. Everything you say from this time
>
> MR. JOHNSON: I understand that.
>
> DEPUTY PETERSON: is going to be tape recorded. Okay.
>
> MR. JOHNSON: I would like to talk to somebody.

2

DEPUTY PETERSON: It is 2:01 a.m. on December 8, 1983, Thursday morning, okay?

MR. JOHNSON: You have an advantage because my hands are handcuffed and I would like to talk to somebody.

DEPUTY PETERSON: You would like to -- who do you want to talk to?

MR. JOHNSON: I am not, I haven't decided yet.

DEPUTY PETERSON: Okay.

MR. JOHNSON: This is dirty pool you guys. God Almighty. Hey, am I off the record here?

DEPUTY PETERSON: No, you are on the record. You are on tape Richard.

(Pause)

MR. JOHNSON: Oops. (unintelligible) I knew that sucker. (Pause) You have to realize right now that you are not getting me for DWI because I was in the ditch. (long pause)

MR. JOHNSON: You know I am going to sue you bastards so bad because I wasn't driving that car. It is going to be fun (Pause) -- You have so much fun hauling guys in. Isn't that fun?.

(Pause)

DEPUTY PETERSON: Who was driving the car Richard?

MR. JOHNSON: I was driving the car.

DEPUTY PETERSON: You were driving the car?

MR. JOHNSON: Yeah. I was driving the car.

DEPUTY PETERSON: How did it get in the ditch?

MR. JOHNSON: Somebody grabbed the wheel.

DEPUTY PETERSON: Who grabbed the wheel then?

MR. JOHNSON: The person I picked up on the way home.

DEPUTY PETERSON: Where did that man go?

MR. JOHNSON: Well you look that guy up. I don't know. No, he was a nice guy. He would

DEPUTY PETERSON: Do you know who it was?

MR. JOHNSON: No, I don't know. Do you know who he was?

DEPUTY PETERSON: No, I don't. I didn't see him.

3

MR. JOHNSON: He is about 6'1". Grabbed the wheel when I went in the ditch there. (Pause) You should have driven up and down the street there aways there.

DEPUTY PETERSON: Why is that?

MR. JOHNSON: Well, you tell me -- you didn't see the guy. Really?

DEPUTY PETERSON: No, I didn't see anybody.

MR. JOHNSON: Well, that's your problem. That's not mine. Go back and look for him.

MR. JOHNSON: So what do I do with these handcuffs?

DEPUTY PETERSON: Well I am going to take them off you here in just a minute Richard.

MR. JOHNSON: Can I go home?

DEPUTY PETERSON: Well soon as I, soon as I'm done with everything we need to do then maybe you can.

MR. JOHNSON: This is a lot of fun being handcuffed you know.

DEPUTY PETERSON: Okay, the time is now 2:08 a.m. on December 8, 1983. I am going to turn the tape off.

A videotape of defendant attempting to perform several physical maneuvers at the request of Officer Peterson was taken upon arrival at the police station. Between maneuvers, defendant asked if he could call his attorney. After the maneuvers were completed and an implied consent form was read to defendant, defendant agreed to submit to a breathalyzer test. The result showed a blood-alcohol concentration of .197.

Next, Officer Peterson again turned on the videotape, advised defendant of his rights and asked if defendant wanted to answer some questions. Defendant replied, "I'd be obliged to, yes." This portion of the videotape was suppressed by the trial judge because of defendant's earlier request for an attorney.

Defendant was incarcerated overnight. On December 19, 1983, an information was filed in Missoula County District

4

Court charging a third offense DUI (Count I) and failure to have current registration (Count II). Count II was subsequently dismissed. After several delays and waivers by defendant of his right to a speedy trial, a jury trial was held February 25, 1985.

At trial, defendant provided a detailed account of his actions on the night of December 7 and the early morning hours of December 8, 1983. Defendant testified that he and his wife ate dinner at the Heidelhaus in Missoula, Montana. After dinner, defendant took his wife home and proceeded to The Edgewater for a night cap. Defendant claimed that he drank two, maybe three, drinks at The Edgewater with a friend. Then, realizing he was nearly out of gas and had no money, defendant contends he drove to a bar in East Missoula called "The Cabin" to cash a check. Apparently defendant had attempted to cash checks at The Edgewater before, to no avail. Defendant further testified that he purchased a double shot drink in a "go cup" at "The Cabin" to drink with his wife upon returning home.

According to defendant's testimony, as he was entering the west-bound lane of I-90 from the on-ramp, the steering in his car locked. It was snowing heavily and the roads were icy. The car headed for the ditch, became high-centered on a snowbank and was thereby rendered immobile. After a short time, a passing motorist allegedly stopped to assist. Because of the motorist's intoxicated condition, defendant refused his offer of a ride but asked the man to phone defendant's wife and a towing service. Thereafter, defendant claims he decided to drink the double shot. Then, remembering some blackberry brandy left in the car from the previous hunting season, defendant alleges he drank approximately three-quarters of a pint bottle to try to keep warm.

5

Defendant further claims not to have started or attempted to move the car after drinking the double shot.

Approximately an hour and a half after the car left the road, Officer Peterson appeared. A tow truck arrived shortly thereafter. Defendant's wife allegedly arrived at the scene, but after her husband had been transported to the police station.

The essence of defendant's story at trial was that he may have been intoxicated at the time Officer Peterson discovered him, but that he had not been "under the influence" at the time the car became stuck on the side of the road. Rather, his intoxication allegedly resulted from the alcohol consumed after the car left the road.

Officer Peterson also testified at trial. He stated that upon first approaching defendant's vehicle, the left front tire was in contact with the pavement; steam or smoke and a smell of burned rubber were emitting from that area. A search of defendant's car and the surrounding area uncovered no discarded beverage containers or brandy bottles. In addition, the inventory sheet signed and prepared by Sergeant Al Kimery, now deceased, failed to indicate the discovery of any alcohol container.

During a break in the trial, Officer Peterson returned to the location where defendant's vehicle was discovered, placed two sheriff's vehicles in the positions previously occupied by defendant's and Peterson's vehicles and took five photographs of the vehicles. The pictures were entered into evidence through Officer Peterson to show the location and angle of defendant's car.

Finally, during rebuttal, Officer Peterson was questioned, based on his experience and training in automobile mechanics, as to what, in his opinion, happens when the

power steering on a vehicle fails. This testimony was elicited in response to testimony of defendant with respect to the alleged failure of his power steering mechanism and the performance of his car at that moment. Defendant had been qualified as an expert in the area because of his experience with power-steering failure in front and rear-wheel drive vehicles.

Following presentation of the evidence, the jury convicted defendant of driving or being in control of a motor vehicle on the public ways of Montana while under the influence of alcohol in violation of § 61-8-401(1), MCA. He was sentenced to one year in the Missoula County Jail with all but fifteen days suspended, ordered to contribute $1,000 to the Missoula City/County Health Department's Drinking and Driving Prevention program and had his driver's license suspended "until he receives a probationary driver's license and then only for driving to and from work and on the job."

On appeal, defendant raises the following issues:

1. Whether the trial judge erred in refusing to grant defendant's motion to suppress his tape-recorded statement, the videotape of his actions and the results of his breathalyzer test?

2. Whether the trial judge erred in admitting into evidence the five photographs of the scene of the incident taken by Officer Peterson at the time of trial?

3. Whether the trial judge erred in permitting the State to elicit "expert" testimony from Officer Peterson with respect to the events following failure of the power steering system in an automobile?

4. Whether the trial judge erred in refusing to grant defendant's motion for a mistrial after the defendant had

7

been unduly prejudiced by the State's reference to a deputy sheriff killed in the line of duty?

5. Whether the trial judge abused his discretion in sentencing defendant, who suffers from claustrophobia, to 15 days in jail?

6. Whether the trial judge illegally sentenced defendant to a term of incarceration by failing to state any reason for the imposition of that condition?

I.

THE MOTION TO SUPPRESS

On August 30, 1984, defendant moved to suppress his tape-recorded statement, the videotape of his actions and the results of his breathalyzer test. The State's motion in opposition was filed September 20, 1984. Then, on October 5, 1984, defendant filed a motion to hold the suppression hearing in abeyance until this Court reached a decision in State v. Armfield (Mont. 1984), 693 P.2d 1226, 41 St.Rep. 2430. Armfield was rendered on December 28, 1984, and a third omnibus hearing was held January 9, 1984. The trial judge issued an order February 19, 1985, holding that our decision in Armfield dispensed with defendant's entire motion to suppress. We disagree.

In Armfield, supra, we held that an individual arrested on a charge of driving while under the influence of alcohol has no constitutional right to the advice of legal counsel prior to deciding whether to submit to a breathalyzer test. We found the breathalyzer test to be analogous to requirements that an accused "submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." Armfield,

8

693 P.2d at 1230, 41 St.Rep. at 2434, citing U. S. v. Wade (1967), 388 U.S. 218, 223, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149, 1155. Which quotes Schmerber v. California (1966), 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916. Thus, defendant's breathalyzer test results are admissible in evidence.

Likewise, the videotape of defendant's attempts to perform specific sobriety tests at the police station is admissible as the performance of the physical maneuvers is not testimonial in nature. Armfield, supra; State v. Purdie (Mont. 1984), 680 P.2d 576, 578, 41 St.Rep. 754, 756.

However, defendant's tape-recorded statement is testimonial and thus potentially self-incriminating. We must therefore determine whether the right to counsel was invoked by defendant.

The United States Supreme Court has held that only a specific request for counsel invokes a defendant's constitutional right of counsel per se. All other requests become part of the "totality of the circumstances" to which the Court refers when determining whether the right to counsel has been invoked.

In Fare v. Michael C. (1979), 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197, a juvenile was taken into custody for suspicion of murder. After a police officer fully advised the juvenile of his Miranda rights, the juvenile asked to see his probation officer. The police denied his request. Thereafter, the juvenile gave a statement implicating himself in the murder. The United States Supreme Court held that a request to see one's probation officer is not analogous to a request for counsel. Rather, it is but one factor to be considered under the "totality of the circumstances" when determining the voluntariness of a subsequent waiver of one's

rights.   *Fare*, 442 U.S. at 722-725, 99 S.Ct. at 2570-2572, 61 L.Ed.2d at 210-212.

Although *Fare* would be analogous to the situation currently before this Court, we refuse to "march lock-step" with the United States Supreme Court where constitutional issues are concerned, even if the applicable State Constitution provisions are identical or nearly identical to those of the United States Constitution.

We recognize that this pronouncement is contrary to previous criminal law decisions issued by this Court.

> Under the Fifth Amendment to the United States Constitution, and under the substantially identically worded Art. II, Section 25, 1972 Montana Constitution, no person may be compelled to testify against himself in a criminal proceeding.  This Court has held the Montana constitutional guarantee of the privilege against self-incrimination affords no broader protection to an accused than does the Fifth Amendment.  *State v. Armstrong*, [170 Mont. 256,] 552 P.2d 616.  The opinions of the United States Supreme Court, therefore, delineate the maximum breadth of the privilege against self-incrimination in Montana.

*State v. Finley* (1977), 173 Mont. 162, 164-165, 566 P.2d 1119, 1120-1121.   See also, *State v. Jackson* (Mont. 1983), 672 P.2d 255, 260, 40 St.Rep. 1698, 1704.  And,

> This Court is not bound by decisions of the United States Supreme Court where independent grounds exist for reaching a contrary result.  (Citations omitted) . . .

> Much has been written about whether a state court should grant greater rights than the United States Supreme Court where the State Constitutional language is identical to that in the Federal Constitution.  In *State v. Jackson* (Mont. 1983), 672 P.2d 255, 40 St.Rep. 1698, a divided court held that the Montana Constitutional guarantee against self-incrimination does not afford greater protection than that afforded under the Federal Constitution.  However, in that instance the language in the Montana Constitution does not afford a basis for distinguishing self-incrimination rights from those articulated in the Federal Constitution.  This Court has afforded greater rights in search and seizure cases because the Montana Constitution specifically recognizes the importance of the right of privacy.

State v. Solis (Mont. 1984), 693 P.2d 518, 521, 41 St.Rep. 2493, 2496-2497.

However, we have forged ahead independent of the United State Supreme Court in civil matters which involve constitutional issues, even where our Constitutional provisions are identical or nearly identical to those of the United States Constitution.

> Art. II, § 4, of our State Constitution provides in part that "[n]o person shall be denied the equal protection of the laws." Art. II, § 4, 1972 Mont. Const. That provision of our State Constitution, though similar in wording to the last clause of the Fourteenth Amendment of the Federal Constitution provides a separate ground on which rights of persons within this state may be founded, and under accepted principles of constitutional law such rights must be at least the same as and may be greater than rights founded on the federal clause. Thus, states may interpret their own constitutions to afford greater protections than the Supreme Court of the United States has recognized in its interpretations of the federal counterparts to state constitutions. City and County of Denver v. Nielson (1977), 194 Colo. 407, 572 P.2d 484. Federal rights are considered minimal and a state constitution may be more demanding than the equivalent federal constitutional provision. Washakie Co. Sch. Dist. No. One v. Herschler (Wyo. 1980), 606 P.2d 310, cert. den. 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28. This is true even though our state constitutional language is substantially similar to the language of the Federal Constitution. Deras v. Myers (1975), 272 Or. 47, 535 P.2d 541, 549 n.17.

Pfost v. State (Mont. 1985), 713 P.2d 495, 500-501, 42 St.Rep. 1957, 1963-1964.

And,

> This Court need not blindly follow the United States Supreme Court when deciding whether a Montana statute is constitutional pursuant to the Montana Constitution . . .

> We will not be bound by decisions of the United States Supreme Court where independent state grounds exist for developing heightened and expanded rights under our state constitution.

Butte Community Union v. Lewis (Mont. 1986), 712 P.2d 1309, 1313, 43 St.Rep. 65, 70.

Likewise, we see no reason not to pursue our own resolution of constitutional matters in criminal cases. Adequate and independent state grounds exist in our own Constitution and statutes to resolve this matter. We choose to rely solely on these adequate and independent grounds. "[A] state court always is responsible for the law of its state before deciding whether the state falls short of a national standard, so that no federal issue is properly reached when the state's law protects the claimed right." Linde, E. Pluribus - Constitutional Theory and State Courts, 18 Ga.L.Rev. 165, 178 (1984).

> The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law. (Citations omitted.)

Sterling v. Cupp (Or. 1981), 625 P.2d 123, 126.

This Court has previously recognized this principle.

> These state constitutional provisions, identical or nearly identical with like language in the United States Constitution and certainly identical in concept, each constitute separate and enforceable constitutional rights insofar as the jurisdiction of the State of Montana extends. Where state and federal constitutional provisions are identical, each is enforceable in its own respective sphere where those principles attach. See, Department of Mental Hygiene v. Kirchner (1965), 62 Cal.2d 586, 43 Cal.Rptr. 329, 400 P.2d 321; Emery v. State of Montana (1978), [177 Mont. 731, 580 P.2d 445.]

Madison v. Yunker (1978), 180 Mont. 54, 60, 589 P.2d 126, 129.

Thus, relying on our own Constitution and applicable law, we hold first that when defendant asked, immediately after having been read his rights, if he had the right to address somebody and subsequently stated that he would like to talk to somebody, he invoked his right to counsel under Art. II, § 24 of the Montana Constitution. This right to

counsel is not and should not be a right easily abridged. The implication of asking to speak to "someone" immediately after the reading of one's rights is that "someone" refers to a legal advisor. Lay people are not learned in constitutional principle nor legal nicety. To require precise words be uttered would elevate form over substance.

Defendant's subsequent conversation with Deputy Peterson did not result in the voluntary waiver of his right to counsel. Although defendant initiated that portion of the conversation wherein Peterson asked defendant who was driving the car, defendant's comments were all part of one taped interview initiated by the deputy. The entire taped conversation lasted only seven minutes. Under these facts, we cannot find that defendant's comments constituted a knowing and voluntary waiver of his right to counsel.

The taped conversation should not have been admitted during the State's case-in-chief. However, because that conversation could have been used by the State to impeach defendant's testimony at trial, we find the error in admitting the tape to be harmless. In the taped conversation, defendant stated that another individual riding in the car with him grabbed the steering wheel, forcing the car off the road. At trial, defendant testified that the car left the road because of a failure in the power steering. Although defendant has every right to take the stand and testify in his own defense, Art. II, § 24, Mont. Const. (1972), once defendant testified to a story different than that upon which he previously relied, defendant "opened the door" to the admissibility of the illegally-obtained evidence for impeachment purposes. W. LaFave and J. Israel, <u>Criminal</u> <u>Procedure</u> § 9.6 (1984).

The situation is analogous to that discussed in Rule 410, M.R.Evid. Rule 410 makes inadmissible pleas of guilty, later withdrawn, except for the purposes of impeachment.

> This rule shall not apply to the introduction of voluntary and reliable statements made in court on the record in connection with any of the foregoing pleas or offers where offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement.

We therefore find harmless any error to defendant arising out of the admission of defendant's taped conversation during State's case-in-chief.

## II.

## ADMISSIBILITY OF THE PHOTOGRAPHS

Trial courts have wide discretion in admitting photographs. State v. Warnick (1982), 202 Mont. 120, 127, 656 P.2d 190, 194.

> [P]hotographs stand on the same footing as diagrams, maps, plans, and the like, and, as a general rule, whenever relevant to describe a person, place, or thing, they are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. (Citations omitted.)

Fulton v. Choteau County Farmers' Co. (1934), 98 Mont. 48, 61-62, 37 P.2d 1025, 1029.

Here, the photographs were received solely for the purpose of describing the position of defendant's vehicle. Although the pictures were taken under conditions substantially dissimilar to the conditions on December 8, 1983, the conditions are basically irrelevant to the purpose of the photographs and the dissimilarities were adequately explained to the jury. There was no abuse of discretion by the trial judge.

III.

ADMISSIBILITY OF OFFICER PETERSON'S TESTIMONY

WITH RESPECT TO POWER STEERING FAILURE

Appellant contends the trial judge erred in qualifying Officer Peterson as an expert and in allowing him to testify with respect to how a car reacts when its power steering mechanism fails. Officer Peterson was not qualified as an expert in auto mechanics pursuant to Rule 702, M.R.Evid. Rather, the trial judge referred to him as a "semi-expert." (Tr. p. 363, l. 18-20) The law of evidence does not recognize a "semi-expert."

Although Officer Peterson was not qualified as an expert witness, his opinion was properly received under Rule 701, M.R.Evid. That rule states:

Opinion testimony by lay witnesses.

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Officer Peterson testified solely with respect to what, on the basis of his own experience, happens to a vehicle when its power steering fails. He did not offer an opinion as to what specifically happened to defendant's vehicle. The testimony served primarily to clarify in the minds of the jurors, who might not have experienced a similar failure, what exactly happens when the power steering system of a car fails. The evidence certainly established that Officer Peterson was qualified to offer his lay opinion. He had worked on vehicles of all kinds for over ten years and had experienced power steering problems several times.

We find no error in the admission of Peterson's opinion.

15

## IV.

### REFERENCE TO THE DECEASED DEPUTY SHERIFF

Appellant contends the State's reference to Sergeant Al Kimery, a deputy sheriff killed in the line of duty near the time of trial, resulted in a sympathetic bias on the part of the jury toward the State. The reference occurred while the state was laying a foundation for the inventory sheet.

Officer Kimery conducted the inventory of defendant's car prior to its impoundment. Because of the nature of defendant's defense, that he became drunk only after his car became stuck, the inventory sheet was relevant evidence. The difficulty of admitting the exhibit without referring to Officer Kimery was obvious and foreseeable. Defendant's remedy was to file a motion in limine prior to the start of trial. Defendant failed to do so. We find no error.

## V.

### CLAUSTROPHOBIA

Defendant contends that he suffers from claustrophobia and that his sentence is therefore cruel and unusual punishment because it requires that he spend 15 days in jail. In support of his contention, defendant submitted a letter from Dr. James E. Gouaux which states in applicable part:

> I believe his main health problem related to being in jail relates to his claustrophobia which apparently has been going on for forty or so years and, if it is aggravated by being in a jail cell, might constitute "cruel punishment."

However, defendant offered no evidence in support of his claim that he does indeed suffer from claustrophobia. Dr. Gouaux makes no such diagnosis in his letter. In fact, he states only that the claustrophobia has "apparently" been going on for more than forty years. No other evidence was submitted by the defendant. Therefore, we find little evidence to support defendant's claim that he suffers from

16

claustrophobia. Further, even if defendant so suffered, it would be but a factor to consider and would not foreclose incarceration. The sentence does not constitute cruel and unusual punishment.

## VI.

### ADEQUACY OF THE REASONS FOR THE SENTENCE

Finally, appellant contends his sentence is illegal because the trial judge failed to set forth his reasons for choosing to incarcerate defendant for 15 days. The sentencing judge is required to state his reasons for imposing incarceration on a defendant, even if the sentence is within the statutory limits for the offense. State v. Stumpf (1980), 187 Mont. 225, 609 P.2d 298. The trial judge has met this requirement.

The following rationale was provided for the sentence: "Defendant's history of alcohol and driving offenses." This statement, especially when coupled with the presentence report provided by defendant's probation officer, is sufficient to inform a reviewing court and the Sentence Review Board as to why the sentence was imposed. Stumpf, 187 Mont. at 226, 227, 609 P.2d at 299. No more is required. The sentence is affirmed.

Affirmed on all counts.

Justice

We concur:

Justices

17

_____
Chief Justice

_____
Justice

18