No. 96-358

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


STATE OF MONTANA,

Plaintiff and Respondent,

v.

SCOTT SCHEETZ,

Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable G. Todd Baugh, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Brad L. Arndorfer, Arndorfer Law Firm,
Great Falls, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General;
Patricia J. Jordan, Assistant Attorney General;
Helena, Montana

Dennis Paxinos, Yellowstone County Attorney;
Dale Mrkich, Deputy County Attorney;
Billings, Montana


Submitted on Briefs: September 11, 1997

Decided:    December 5, 1997
Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Scott Scheetz was charged in the District Court for the Thirteenth Judicial District
in Yellowstone County with criminal possession of dangerous drugs with intent to sell
after a drug-detecting canine led officers to search his airline luggage, in which they
discovered eighteen pounds of marijuana.  He filed a motion to suppress the seized
evidence.  The District Court denied his motion.  Scheetz pled guilty and now appeals
the District Court's denial of his motion to suppress.  We affirm the order and judgment
of the District Court.

The sole issue on appeal is whether the use of a drug-detecting canine to sniff
luggage which has been entrusted to an airline constitutes a search in violation of a
person's right to privacy guaranteed by Article II, Sections 10 and 11, of the Montana
Constitution.

FACTUAL BACKGROUND

On February 9, 1995, Officer Lawrence Leighton of the Tucson Airport Authority
Police Department noticed Scott Scheetz and two other men acting nervously prior to
checking in for their flight.  The individuals became cautious when they were walking
toward the check-in counter and noticed the uniformed Leighton.  Rather than proceed
directly to the counter where no one else was waiting in line and where they could have
checked in immediately, they became "quite serious" and retreated to some nearby
couches.  They talked among themselves and "continued to appear nervous."  Two of the
individuals walked away and left Leighton's view for a minute or two, while the third
remained at the couch with a large, new, hard-sided suitcase.  All of the men avoided eye
contact with Leighton throughout his observations of them.

Fifteen minutes prior to their flight's departure, the three men checked in at the
counter and checked the suitcase.  Leighton, who had been with the Airport Authority
Police for five years and investigated approximately two hundred narcotics cases, and
who had received advanced officer training in narcotics recognition, suspected that the
three men were trafficking narcotics.  He inspected the luggage in the baggage area
immediately after the men checked it.  He found that the luggage tag listed only the name
of John Olson and a telephone number.  Leighton also investigated the men's travel plans
and found that they had been made through a travel agent very shortly before the flight,
and that the men had been in Tucson for approximately two days.

Based on his experience and the men's behavior, Leighton contacted the Billings
Police Department and informed them of his suspicion that the men were trafficking
narcotics.  He provided descriptions of the men, their flight number, and their time of

arrival in Billings.  The men, while traveling, were going by the names of John Olson,
Chris Anderson, and Bob Jones.  When Detective Steve Cwalinski of the Billings Police traced the phone number on the luggage tag, he found that it was for a Billings restaurant.

Officer Cwalinski, accompanied by a drug-detecting canine and its handler and a DEA agent, met the flight when it landed at the Billings airport.  Before the luggage was loaded onto the carousel, the canine was directed to sniff the luggage from the flight. The canine's reaction indicated that the suitcase matching the description given by Leighton contained drugs.

Cwalinski identified two men matching the description given by Leighton as they waited near the carousel for their luggage.  One of the two men took the suitcase that had been identified by the canine and Leighton when it came off the carousel.  He removed the tags and threw them in the trash.  Cwalinski retrieved the discarded tags, which listed John Olson and the phone number, approached the men, and identified himself as an officer.  He advised them of his investigation and escorted them to an office in the airport.

After separating the men, the officers advised Scheetz of his Miranda rights. Scheetz, who had removed the suitcase from the carousel, identified himself as John Olson, and initially refused to give his consent to search his suitcase, although he eventually admitted that he had drugs in the suitcase, and was placed under arrest. The officers obtained a search warrant for the suitcase and found that it contained approximately eighteen pounds of marijuana.

On March 1, 1995, the Yellowstone County Attorney filed an information charging Scheetz with criminal possession of dangerous drugs with intent to sell and criminal possession of drug paraphernalia.  On August 8, 1995, Scheetz filed a motion to suppress the evidence against him, based upon what he asserted was the State's invasion of his privacy by the use of a drug-detecting canine.  After briefing and a hearing, the District Court concluded that the use of a drug-detecting canine was not a search and, accordingly, denied the motion.  On March 6, 1996, Scheetz pled guilty to the charges, but reserved his right to appeal the denial of his motion to suppress.  The District Court accepted the plea and sentenced Scheetz to ten years of imprisonment, with five years suspended.

## DISCUSSION

Does the use of a drug-detecting canine to sniff luggage which has been entrusted to an airline constitute a search in violation of a person's right to privacy guaranteed by Article II, Sections 10 and 11, of the Montana Constitution?

We review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law is correct.  See State v. Graham (1995), 271 Mont. 510, 512, 898 P.2d 1206, 1207-08; State v. Stubbs (1995), 270 Mont.

364, 368, 892 P.2d 547, 550.

The use of drug-detecting canines to inspect luggage is an issue of first impression in Montana.  Although search and seizure protections are traditionally founded on the Fourth Amendment of the United States Constitution, we stated in State v. Sawyer (1977), 174 Mont. 512, 515, 571 P.2d 1131, 1133, that "[w]e need not consider the Fourth Amendment issue because we view the Montana Constitution to afford an individual greater protection . . . than is found under the Fourth Amendment."  We also explained in State v. Siegal (Mont. 1997), 934 P.2d 176, 184, 54 St. Rep. 158, 164, that when a right of privacy is specially implicated as part of a traditional search and seizure analysis, we must address the issue pursuant to both Sections 10 and 11 of Article II of the Montana Constitution.  Article II, Section 10, states: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."  Article II, Section 11, states: The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures.  No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

A threshold question in the determination of whether an unlawful search has occurred is whether there has been government intrusion into an area where privacy is reasonably expected.  The U.S. Supreme Court stated in United States v. Jacobsen (1984), 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85, 94, that "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  We stated in State v. Loh (1995), 275 Mont. 460, 914 P.2d 592, that "[a] search compromises the individual interest in privacy."  Loh, 275 Mont. at 468, 914 P.2d at 597 (quoting Horton v. California (1990), 496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112, 120).  "Where no reasonable expectation of privacy exists, there is neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution."  State v. Bennett (1983), 205 Mont. 117, 121, 666 P.2d 747, 749.

In United States v. Place (1983), 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110, the U.S. Supreme Court held that exposing a person's luggage, which is located in a public place, to a drug-detecting canine is not a search within the meaning of the Fourth Amendment.  Place involved facts similar to these.  An airport officer relied on his suspicions of drug trafficking to alert officers in the passenger's destination city to conduct a canine investigation of the passenger's luggage.  The Supreme Court reasoned that the investigation was þmuch less intrusive than a typical search,þ and that þthe information obtained is limited.þ  Place, 406 U.S. at 707, 103 S. Ct. at 2644, 77 L.

Ed.
2d at 121.

States are free to grant citizens greater protection based on state constitutional
provisions than the U.S. Supreme Court divines from the U.S. Constitution.  See City of
Mesquite v. Aladdin's Castle, Inc. (1983), 455 U.S. 283, 293, 102 S. Ct. 1070, 1077,
71 L. Ed. 2d 152, 162; Sawyer, 174 Mont. at 515, 571 P.2d at 1133.  Nonetheless, most
states that have addressed the use of drug-detecting canines have followed Place and have
held that the use of drug-detecting canines does not constitute a search.  See State v.
Weinstein (Ariz. Ct. App. 1997), 246 Ariz. Adv. Rep. 45, 1997 WL 340743; Vega v.
State (Ark. Ct. App. 1997), 939 S.W.2d 322;  State v. Snitkin (Haw. 1984), 681 P.2d
980; State v. Martinez (Idaho Ct. App. 1996), 925 P.2d 1125; State v. Barker (Kan.
1993), 850 P.2d 885; State v. Washington (La. Ct. App. 1997), 687 So. 2d 575; Gadson
v. State (Md. 1995), 668 A.2d 22, cert. denied (1996), 116 S. Ct. 1704, 134 L. Ed. 2d
803; State v. Morrison (Neb. 1993), 500 N.W.2d 547; Gama v. State (Nev. 1996), 920
P.2d 1010; State v. Kesler (N.D. 1986), 396 N.W.2d 729; Scott v. State (Okla. Crim.
App. 1996), 927 P.2d 1066; State v. Knight (Ohio Com. Pl. 1997), 679 N.E.2d 758.
But see Pooley v. State (Alaska. Ct. App. 1985), 705 P.2d 1293; People v. May (Colo.
1994), 886 P.2d 280; State v. Torres (Conn. 1994), 645 A.2d 529; State v. Gifford (Me.
1992), 604 A.2d 45; State v. Pellicci (N.H. 1990), 580 A.2d 710; People v. Dunn (N.Y.
1990), 564 N.E.2d 1054, cert. denied (1991), 501 U.S. 1219, 111 S. Ct. 2830, 115 L.
Ed. 2d 1000; State v. Juarez-Godinez (Or. 1997), 942 P.2d 772; Commonwealth v. Cass
(Pa. Super. Ct. 1995), 666 A.2d 313.

Montana, however, recognizes broader protections for an individual's right of
privacy pursuant to Article II, Section 10, of Montana's Constitution, than the United
States Supreme Court does pursuant to the Fourth Amendment of the United States
Constitution, and other states typically do pursuant to their state constitutions.  See
Sawyer, 174 Mont. at 516, 571 P.2d at 1133.  As we apply the Montana Constitution,
we have chosen not to "march lock-step" with the United States Supreme Court, even
when applying nearly identical language.  State v. Johnson (1986), 221 Mont. 503, 512,
719 P.2d 1248, 1254.  Thus, Place is not determinative of whether the government's use
of a drug-detecting canine violates the Montana Constitution.

To determine whether the use of a drug-detecting canine constitutes a search in
light of Montana's right to privacy, we look first to two recent decisions in which we
have protected the right of privacy from state intrusion.

First, in State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61, we recognized that
a person may have a reasonable expectation of privacy in land that extends beyond the
curtilage of his residence.  In Bullock, the defendant had posted "No Trespassing" signs,
moved his cabin far away from the public road to a point where it was hardly visible, and
gated access to his property.  The precautions he took to protect his property from

intrusion were a sufficient basis for this Court's recognition of his right to privacy beyond the curtilage of his residence and potentially into what other states or the United States Supreme Court might classify as open fields. See United States v. Dunn (1987), 480 U.S. 294, 107 S. Ct. 1134, 94 L. Ed. 2d 326. Accordingly, we held that entry by the state onto the private property constituted a search and required a warrant or the owner's consent.

Next, in State v. Siegal (Mont. 1997), 934 P.2d 176, 54 St. Rep. 158, we held that the state's use of a thermal imaging device to "view" conditions inside a building on private property constituted a search in violation of the defendant's right to privacy, even though most other states have held otherwise. See Siegal, 934 P.2d at 185-92, 54 St. Rep. at 165-71 (discussing at length the cases and their reasoning). In Siegal, we relied on substantial legislative history from the 1972 Montana Constitutional Convention to conclude that "thermal imaging . . . is the very sort of technology against which Article II, Section 10, of Montana's Constitution, was enacted to guard." Siegal, 934 P.2d at 192, 54 St. Rep. at 171. Accordingly, we held that its use constitutes a search and requires the demonstration of a compelling state interest.

To determine what constitutes a search pursuant to Article II, Section 11, of the Montana Constitution, we have considered, in Bullock, Siegal, and other cases involving search and seizure, two separate factors: (1) the extent of the privacy expectation; and (2) the nature of the state's intrusion. Here, Scheetz contends that the canine sniff of his luggage, after he had already surrendered it to the airline, constituted an offensive intrusion into his privacy sufficient to be a search triggering constitutional safeguards. We disagree.

Our first consideration is whether Scheetz had a legitimate expectation of privacy that society is willing to recognize as objectively reasonable. That expectation exists and can be determined independent of and prior to any intrusion by either the public or the state. In other words, we recognize that naturally a person seeks to protect certain parts of his or her privacy, and it is those desires which are at the foundation for the constitutional safeguards that exist to protect them. See generally State v. Solis (1984), 214 Mont. 310, 693 P.2d 518.

This Courtþs recognition of a legitimate expectation of privacy has been based on various factors, such as the place of the investigation and the control exercised by the

person over the property investigated. Those factors are not present in this case.

In Bullock and Siegal, we validated the long-standing notion throughout this country, but especially in Montana, that a person's residence and his homestead are secure from unwarranted government intrusion, be it by physical or technological means.
See also State v. Rushton (1994), 264 Mont. 248, 870 P.2d 1355; City of Billings v. Whalen (1990), 242 Mont. 293, 790 P.2d 471; State v. Olson (1979), 180 Mont. 151, 589 P.2d 663. See generally United States v. Karo (1984), 468 U.S. 705, 714-15, 104 S. Ct. 3296, 3302-03, 82 L. Ed. 2d 530, 541 ("[a]t the risk of belaboring the obvious,
private residences are places in which the individual normally expects privacy free of
governmental intrusion not authorized by a warrant, and that expectation is plainly one
that society is prepared to recognize as justifiable"); Gryczan v. State (Mont. 1997), 942
P.2d 112, 54 St. Rep. 699 (denying the states attempt to regulate the private sexual practices of consenting adults). In fact, of the courts that have distinguished Place and
held canine sniffs to be searches, many have done so on the basis that the canine sniff
occurred at a person's home. See United States v. Thomas (2d. Cir. 1985), 757 F.2d 1359; Dunn, 564 N.E.2d 1054.

However, even in Montana, when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception,
it is clear that he cannot expect to preserve the same degree of privacy for himself or his
affairs as he could expect at home. "What a person knowingly exposes to the public is
not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Bullock, 272 Mont. at 375,
901 P.2d at 70 (citing Katz v. United States (1967), 389 U.S. 347, 351, 88 S. Ct. 507,
511, 19 L. Ed. 2d 576, 582). We also stated in State v. Dess (1982), 201 Mont. 456, 464, 655 P.2d 149, 153, that "[t]he reasonableness of [the defendant's] expectation of
privacy turned on the defendant's right to exclude others from the premises."

Here, the luggage that a person brings to the airport is generally subject to observation by the public or the state to the extent that other significant steps have not
been taken to preserve the privacy of it and its contents. For example, a person cannot
expect to conceal completely from the public the odor of the luggage or its contents, its
color, or even its weight since it must be handled by others. Accordingly, we conclude
that a person lacks a reasonable expectation of privacy in the smell of luggage that he or
she brings to an airport in the same way that he or she lacks an expectation of privacy

in the color or weight of the luggage.  See generally People v. Mayberry (Cal. 1982), 644
P.2d 810, 814 (declaring a lack of privacy in both the escaping smell of contraband from
luggage and the visibly leaking fluid from a container); People v. Bramma (N.Y. Dist. Ct. 1997), 655 N.Y.S.2d 280, 282 ("[t]he Court is not aware of any case holding that there is a reasonable expectation of privacy to the odors emanating from one's person or
in the air surrounding one's possessions"); Brown v. Commonwealth (Va. Ct. App. 1992), 421 S.E.2d 877, 880 ("[a] reasonable expectation of privacy did not extend to the
airspace surrounding appellant's vehicle").

Therefore, while a person maintains a privacy interest in the contents of his checked luggage, we conclude that by checking the luggage, he manifests less of an expectation of privacy than if he was to maintain its control and possession by not checking it.  Accordingly, we conclude that a person does not maintain a sufficient expectation of privacy in luggage entrusted to an airline that the Montana Constitution
prohibits inspection of that luggage by a dog trained to detect the presence of drugs by
sniffing the luggage.

A second consideration is the nature of the stateþs intrusion.  The Delegates to the
Montana Constitutional Convention recognized that þthe state must come into our private
lives at some point.þ  However, they established an explicit right of privacy to create a
"semipermeable wall" between the state and the individual, such that the state should not
intrude upon the individual in the form of a search unless it has a very good reason for
doing so.  Montana Constitutional Convention, Verbatim Transcript March 7, 1972, page 1681.  Therefore, we also consider whether the state's method of investigation is so personally invasive that we recognize the intrusion as a search that requires further justification, such as a warrant or other special circumstances.  See State v. Stubbs (1995), 270 Mont. 364, 892 P.2d 547; State v. Ulrich (1980), 187 Mont. 347, 609 P.2d 1218.

The use of a drug-detecting canine to investigate a person's luggage presents a less
substantial threat of revealing unnecessary aspects of an individual's private affairs than
does the state's intrusion into a person's gated private property or their privacy via a
thermal imaging device.  As we pointed out in Siegal, "thermal imagers provide information about heat emissions both legal and illegal while canine sniffs only provide
information about the presence of illicit substances."  Siegal, 934 P.2d at 187, 54 St.
Rep. at 167. Similarly, in Bullock, the state's invasion was over-broad:  when officers
ignored posted warnings, entered the defendant's private property, and peered unrestricted

into areas of the defendant's homestead which would otherwise have been obstructed from public view, the state forcefully acquired the power to scrutinize all areas of the defendantþs homestead, thus frustrating not only his right, but also his ability to preserve privacy in the area around his home.  In contrast, a drug-detecting canine allows the state very limited and discriminating observation of a person's private affairs.  A canine sniff might reveal to the state the presence of contraband in a person's luggage, but it divulges nothing else about the contents of the luggage, and it permits a person to maintain as private everything except the contraband.

In addition to the fact that the use of a drug-detecting canine to inspect checked airline luggage reveals limited information about the defendant's private affairs, the method of the state's intrusion is inoffensive.  A canine sniff can be conducted without delaying a traveler and without opening a person's luggage, whereas another form of investigation might subject the owner of the property to significant embarrassment and inconvenience.  The fact that a traveler has already surrendered possession of his checked luggage also means that he has not been subjected to a seizure of his property. Accordingly, we conclude that the use of a drug-detecting canine to inspect checked airline luggage does not offensively intrude upon or invade a personþs privacy so as to constitute a search.

We conclude that the stateþs use of a drug-detecting canine to inspect checked airline luggage does not violate a personþs right to privacy, pursuant to Article II, Section 10, of the Montana Constitution, and that it is neither a search nor a seizure pursuant to Article II, Section 11, of the Montana Constitution. Therefore, we conclude that the District Court properly dismissed Scheetzþs motion to suppress, and we affirm the judgment of the District Court.

/S/   TERRY N. TRIEWEILER


We Concur:

/S/   J. A.  TURNAGE
/S/   JAMES C. NELSON
/S/   KARLA M. GRAY
/S/   WILLIAM E. HUNT, SR.
/S/   JIM REGNIER


Justice W. William Leaphart, dissenting.

I respectfully dissent from the majority opinion. I would hold that sniff examinations performed by trained narcotics dogs constitute a search within the meaning of Article II, Sections 10 and 11 of the Montana Constitution. I would further hold that in order to conduct such a search within constitutional parameters, law enforcement must have a particularized suspicion that drug trafficking activity is taking place. Finally, I would hold that law enforcement in this case did not have a particularized suspicion to perform a sniff search on Sheetz's luggage.

I

Article II, Section 11 of the Montana Constitution provides that "[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures." We noted in State v. Solis (1984), 214 Mont. 310, 693 P.2d 518, and affirmed in State v. Siegal (Mont. 1997), 934 P.2d 176, 54 St.Rep. 158, that "[t]he right to privacy is the cornerstone of protections against unreasonable searches and seizures. Thus a warrantless search can violate a person's right of privacy and thereby violate the right to be free from unreasonable searches and seizures." Solis, 693 P.2d at 522-23. Accordingly, a threshold question in determining whether a search occurred is whether there has been a governmental intrusion into an area where privacy is reasonably expected. In determining whether there is a reasonable expectation of privacy this Court looks to Article II, Section 10 of the Montana Constitution which provides:

> The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

We employ a two-part test in determining whether an individual has a constitutionally protected right to privacy: the individual must have a subjective expectation of privacy and that expectation must be one that society views as reasonable. Solis, 693 P.2d at 520. Therefore, we must determine first whether Sheetz had an expectation of privacy in the luggage and then whether his expectation was one that society views as objectively reasonable. Sheetz testified that when Officer Cwalinski asked to look in his suitcase, he refused to consent to the search. In addition, Sheetz asserts in his brief that "[w]e should . . . expect privacy in our luggage." Thus, Sheetz contends that he had a subjective expectation of privacy in his luggage.

When an individual packs his personal belongings in a suitcase, he seeks not only to contain but also to conceal the contents of the luggage. The Court recognizes that "a

person maintains a privacy interest in the contents of his checked luggage . . ." but concludes that, "by checking luggage, he manifests less of an expectation of privacy than if he were to maintain its control and possession by not checking it." By making a distinction between checked luggage which is entrusted to airline personnel and carry-on baggage over which an individual maintains control and possession, the Court effectively holds that when an individual checks his baggage he loses any meaningful expectation of privacy in the contents of his luggage.

I agree with the majority that an individual enjoys a heightened expectation of privacy in his person and in items in his personal possession. I disagree, however, with the conclusion that when a person "surrenders" his luggage at the check-in counter he has less of an expectation of privacy in the contents of that luggage. When traveling by airplane, certain items may be carried on, but others, due to their size or dimensions must be checked because they cannot be properly stowed in the cabin of the plane. While the record does not reveal the exact dimensions of the luggage involved in this case, it is described in the transcripts as "a large black Delsey brand suitcase" indicating that the airline may have required that it be checked. In many instances, including perhaps this case, individuals do not have a choice of whether to check their baggage or to carry it on. The mere fact that a suitcase has been checked does not lead to the conclusion that its owner has voluntarily surrendered it and has thereby evinced less of an expectation of privacy in its contents. I would conclude that society is willing to recognize as objectively reasonable an individual's expectation of privacy in the contents of his luggage whether it be checked in or carried on.

In addition to considering the reasonableness of an individual's expectation of privacy, this Court considers the nature of the state's intrusion when determining what constitutes a search. In the course of analyzing the constitutionality of thermal imaging in Siegal, we distinguished dog sniff procedures from thermal imaging searches by concluding that dog sniffs are more limited because they detect only illegal substances and do not reveal any information about the legal contents of the area being searched. Siegal, 934 P.2d at 186-87. While I agree that dog sniffs are more limited in this sense; they are, nonetheless, similar to thermal imaging in that they detect substances "which [individuals] do not knowingly expose to the public." Siegal, 934 P.2d at 191. As we

indicated in State v. Bullock (1995), 272 Mont. 361, 375, 901 P.2d 61, 70, "[w]hat a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Bullock, 901 P.2d at 70 (citing Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576) (emphasis added).

The Court reasons that an individual does not have a privacy interest in characteristics of luggage that the public can readily observe in the airport such as its weight and color. With this I agree. However, the Court further concludes that an individual does not have a privacy interest in the air space surrounding his luggage and thus no interest in any odor detectable in that airspace. It is at this point that the Court takes a leap in analysis that I am not willing to take. In Siegal, we distinguished between "visible light [which] is perceived by the human eye, usually unaided, [and] infrared radiation [which], because of its longer wave length cannot be 'seen' without the aid of a device, commonly known as a thermal imager." Siegal, 934 P.2d at 180. In a similar fashion, I would distinguish between odors that can be detected by humans and those that are detectable only with the use of devices or dogs with a sense of smell far exceeding that of a human.

We recognized in Siegal that most courts which have addressed the use of thermal imaging in the investigation of marijuana growing operations, have held that the procedure does not constitute a search and does not violate the Fourth Amendment of the United States Constitution. Siegal, 934 P.2d at 181. However, we noted that in specifically providing Montanans with a constitutional right to privacy, the delegates of the 1972 Montana Constitutional Convention expressed particular concern with governmental intrusion through the use of various types of electronic monitoring and surveillance. Siegal, 934 P.2d at 191. Accordingly, we held in Siegal that the use of thermal imaging is a search subject to the warrant requirement of Article II, Section 11 of the Montana Constitution. Siegal, 934 P.2d at 190-91.

The Court holds that "when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception, it is clear that he cannot expect to preserve the same degree of privacy for himself or his affairs as he could expect at home." While I agree with that proposition, I do not view a dog's sense of smell as within the "public's independent powers of perception." I would distinguish, as we did in Siegal, between characteristics of the luggage which are detectable to human senses and those that are only detectable with the assistance of a

canine's more sophisticated olfactory sense.  Although a trained narcotics detection dog
is not an electronic detection device, "a dog does more than merely allow the police to
do more efficiently what they could do using only their own senses.  A dog adds a new
and previously unobtainable dimension to human perception.  The use of dogs, therefore,
represents a greater intrusion into an individual's privacy."  United States v. Place
(1983), 462 U.S. 696, 719-20, 103 S.Ct. 2637, 2651, 77 L.Ed.2d 110 (Brennan, J.,
concurring).    In light of Sheetz's subjective expectation of privacy and the fact that
society is, I believe, willing to recognize a reasonable expectation of privacy in the
contents of checked luggage, I would hold that the use of a trained narcotics dog to sniff
the contents of checked airline luggage intrudes upon a protected privacy interest in a
manner that constitutes a search within the meaning of Article II, Sections 10 and 11 of
the Montana Constitution.

                                II

     While I would hold that a dog sniff investigation of luggage at an airport amounts
to a search, I would further hold that it does not rise to the level of a type of search
requiring probable cause and a search warrant.  The Supreme Court, in United States v.
Place, held that dog sniff procedures do "not constitute a 'search' within the meaning of
the Fourth Amendment" but, nonetheless, amount to an investigatory detention requiring
that officers have at least a reasonable suspicion before conducting a dog sniff.  Place,
462 U.S. at 696 ("we conclude that when an officer's observations lead him reasonably
to believe that a traveler is carrying luggage that contains narcotics, the principles of
Terry and its progeny would permit the officer to detain the luggage briefly to investigate
the circumstances that aroused his suspicion provided that the investigative detention is
properly limited in scope").

     Since Place, several courts have followed the same analysis by analogizing dog
sniffs to what has been termed a Terry investigatory stop which requires that officers
have a reasonable suspicion before proceeding with an investigation.  See, e.g., State v.
Martinez (Idaho App. 1996), 925 P.2d 1125; People v. Boylan (Colo. 1993), 854 P.2d
807; State v. Torres (Conn. 1994), 645 A.2d 529; Commonwealth v. Johnston (Pa.
1987), 530 A.2d 74.  This Court also recognizes the principles of Terry v. Ohio (1968),
392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, or what have been termed Terry
investigations as exceptions to the probable cause warrant requirement of Article II,

Section 11.  See, e.g., State v. Lott (1995), 272 Mont. 195, 900 P.2d 306 (automobile exception); State v. Graham (1995), 271 Mont. 510, 898 P.2d 1206 (search incident to arrest); State v. Stubbs (1995), 270 Mont. 364, 892 P.2d 547 (stop and frisk exception);
State v. Dow (1992), 256 Mont. 126, 844 P.2d 780 (hot pursuit).

In recognizing these exceptions to the warrant requirement, we balance the compelling state interest in conducting an investigatory type search under exigent circumstances with the individual's right of privacy and right to be free from unreasonable searches and seizures.  We note that these exceptions to the warrant requirement, while not requiring probable cause, still implicate search and seizure protections. State v. Anderson (1993), 258 Mont. 510, 516, 853 P.2d 1245, 1249.  Thus,
investigatory searches conducted pursuant to a warrant exception require that law enforcement have a reasonable or "particularized suspicion" that criminal activity is taking place.

Montana's constitutional right of privacy requires that the state have a compelling
state interest for intruding upon one's right to privacy.  When government intrudes upon
a fundamental right, any compelling state interest for doing so must be closely tailored
to effect only that compelling interest.   State v. Pastos (1994), 269 Mont. 43, 47, 887
P.2d 199, 202.  More specifically, while the state has a compelling interest in preventing
drug courier activities in airports, that interest must be carefully tailored to effect only
that compelling interest and must be balanced against an individual's right to privacy in
the contents of his baggage.

I agree with the Court that a dog sniff search is limited in both its invasiveness and
what it can detect (only illegal substances).  Furthermore, I recognize that the transient
status of luggage in an airport environment distinguishes this case from the thermal image
search of a stationary building in Siegal.  Thus, in contrast to Siegal, I would not subject
canine sniffs to the probable cause requirement of Article II, Section 11 of the Montana
Constitution.  On the other hand, I disagree with the Court's allowing, carte blanche,
canine sniffs of checked airport luggage in the absence of a particularized suspicion.

We expressed concern in Siegal that "there is presently nothing to stop law enforcement from simply selecting structures or a neighborhood at random and then scanning every home (or building) to determine whether any of the structures are generating a suspicious heat signature." Siegal, 934 P.2d at 190.  Likewise, under this
Court's opinion there is nothing to prevent law enforcement from housing a trained narcotics dog in the luggage area of any airport to randomly sniff every piece of luggage

that passes by on the conveyor belt. Moreover, given the imperfect nature of a dog's sense of smell we should not allow law enforcement to randomly sniff search luggage without at least a particularized suspicion to support the search. Therefore, rather than allow canine sniffing at the unbridled discretion of law enforcement, I would recognize airport dog sniff searches as an exception to the warrant requirement, and require that law enforcement have a particularized suspicion that an individual is involved in criminal activity before using trained narcotics dogs to sniff search the contents of airline luggage.

III

Finally, I would hold that law enforcement did not have a particularized suspicion justifying an investigatory sniff search of Sheetz's luggage by a drug detecting dog. In State v. Reynolds we noted that "the issue of whether or not a particularized suspicion existed in order to justify an investigatory stop is factually driven." Bauer v. State (1996), 275 Mont. 119, 125, 910 P.2d 886, 889 (citing State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 543). When the totality of the circumstances does not create a particularized suspicion, the investigatory stop is not justified. Bauer, 910 P.2d at 889-90. Realizing that the term "particularized suspicion" resulted in ambiguities for law enforcement, we explained that the particularized suspicion must be comprised of objective data and circumstantial evidence from which "a trained officer draws inferences and makes deductions that lead the officer to a resulting suspicion that the individual is involved in criminal activity." Anderson, 853 P.2d at 1248. In the case at hand, Officer Leighton did not have objective data and circumstantial evidence supporting a particularized suspicion justifying an investigatory sniff search of Sheetz's luggage.

Officer Leighton of the Tucson Airport Authority testified that he was suspicious of Sheetz and his companions because they were "exhibiting signs of nervousness." Officer Leighton explained that when he noticed the three individuals near the Continental Airlines ticket counter, each of them was carrying a duffle bag and one was pulling a new, hard-sided suitcase. He further explained that they were walking casually and talking among themselves. According to his account, when the three young men noticed Officer Leighton in his uniform, they stopped, continued talking among themselves and proceeded to stand by some couches near the ticket counter. Two of the individuals left Officer Leighton's view for a few minutes, while the third remained with the luggage and "stared straight ahead towards the ticket counter . . . ." Officer Leighton noted that he was not able to make eye contact with the individual who stayed with the luggage. The

two individuals returned a few minutes later, and they all checked in about fifteen minutes before their flight.

Based on this "suspicious" conduct, Officer Leighton decided to investigate their travel plans. He found that they had purchased their tickets from a travel agent and visited Tucson for only a couple of days. Officer Leighton checked the identification tag on the hard-sided suitcase; only a name and a phone number appeared on the tag. Officer Leighton explained that he had been trained to look for a "combination of characteristics" when investigating possible drug trafficking activity. Although Officer Leighton denied using a "profile," he nonetheless explained that the appearance of the individuals and the circumstances of their travel led him to believe that Sheetz and his companions were involved in drug trafficking activity. As a result, Officer Leighton called the Billings Police Department, reported his suspicions, and recommended that the Billings Police perform a sniff search on the luggage when it arrived in Montana.

In contrast, Sheetz explained his conduct as follows: He and two friends walked into the airport near the Continental Airlines ticket counter. Each of his friends carried a duffle bag; Sheetz had a backpack, a camera bag and was pulling a hard-sided suitcase. They noticed that there were not many people in the airport, so they proceeded to the couch area and two of the individuals used the restroom. Shortly thereafter, they checked in at the ticket counter and checked their baggage. Sheetz does not recall seeing Officer Leighton at the Tucson Airport. Sheetz further testified that he arranged his travel plans with a travel agent approximately one week before his trip and spent three days in Tucson, conduct which he likened to any traveling business person.

I dare say that Officer Leighton's inability to make eye contact with three young, long-haired men who talked among themselves and stood by a couch near the ticket counter until about 15 minutes before their flight would not lead a reasonable person to believe Sheetz and his companions conducted themselves in a manner consistent with drug trafficking activity. Even when Officer Leighton subsequently learned that they had purchased tickets from a travel agent and had only visited Tucson for a couple of days, the totality of the circumstances did not amount to a particularized suspicion warranting the sniff search that occurred in this case. Officer Leighton's testimony that he believed the individuals were "exhibiting signs of nervousness" was based on "nothing more substantial than [an] inarticulate hunch[]," a standard which the United States Supreme

Court, and this Court have rejected as insufficient to warrant an investigatory intrusion.
Reynolds, 899 P.2d at 542 (citing Terry, 392 U.S. at 22).  Officer Leighton merely saw
three young men with long hair, ponytails and facial hair.  Such innocuous characteristics
do not warrant the government's allowing a trained "canine cannabis connoisseur" to savor the subtle aromas emanating from a traveler's baggage.  I dissent.


/S/  W. WILLIAM LEAPHART