No. 03-847

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 81

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

JOSEPH LEE BUCK,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Eleventh  Judicial District,
                      In and For the County of Flathead, Cause No. DC-2002-362(A)
                      Honorable Ted O. Lympus, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

        Mark R. Sullivan, Attorney at Law, Kalispell, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Robert Stutz,
        Assistant Attorney General, Helena, Montana

        Edward Corrigan, Flathead County Attorney, Kalispell, Montana


                      Submitted on Briefs:  March 1, 2005

                      Decided:  April 25, 2006


Filed:

                                  Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Following a jury trial in the District Court of the Eleventh Judicial District, Flathead County, Joseph Lee Buck (Buck) was convicted of the offenses of deliberate homicide with the use of a weapon, and burglary.  From his convictions, Buck appeals.  We affirm.

¶2     Buck presents the following issues on appeal:

¶3     1.  Did the District Court err in denying Buck's Motion to Suppress?

¶4     2.  Did the District Court err in denying Buck's Motion *in Limine* seeking to exclude evidence of his methamphetamine use?

¶5     3.  Did the District Court err in denying Buck's request for funds to employ a jury consultant and submit supplemental juror questionnaires?

¶6     4.  Did the District Court err in granting the State's Motion *in Limine* regarding hearsay?

¶7     5.  Did the District Court err in denying Buck's Motion for Change of Venue and his related "Motion for Expenditure of County Funds to Conduct a Public Opinion Survey"?

¶8     6.  Did the District Court err in denying Buck's "Motion for Expenditure of County Funds for Employment of a Medical Expert"?

¶9     7. Did the District Court err in limiting the testimony of Buck's expert witness, Dean Wideman?

## FACTUAL AND PROCEDURAL BACKGROUND

¶10 During the early morning hours of October 25, 2002, George Evans (Evans), age sixty-four, was beaten to death by an intruder in his home in Kalispell, Montana. During a custodial interrogation two weeks later, Buck admitted that he had entered Evans' home and attacked him. In its Judgment and Sentence, the District Court described the incident as follows:

> On October 25, 2002, between approximately 2:00 and 3:00 in the morning, the Defendant unlawfully entered the Kalispell residence of George Evans with the purpose to steal a number of the firearms Mr. Evans was known to have collected and stored at that location. When Mr. Evans awoke during the course of that Burglary, the Defendant assaulted him with such violence that he broke five rifles over Mr. Evans' head and back . . . it appears that the Defendant also kicked or stomped Mr. Evans with sufficient force to cause multiple, bilateral rib fractures. At some point during the assault, he bound Mr. Evans' hands behind his back, duct-taped his eyes, and left him to die face down on the floor. The Defendant subsequently left the residence, stealing an unknown quantity of currency and a pair of Mr. Evans' boots.

¶11 In December of 2002, the State filed its Information charging Buck with deliberate homicide pursuant to § 45-5-102, MCA. Buck pled not guilty. Thereafter, the State filed a Notice indicating that it would not seek the death penalty, stating "the prosecutor believes that there is non-sufficient evidence to establish . . . the statutory aggravating factors necessary to impose the death penalty under Montana Law."

¶12 In March of 2003, the State filed notice of its intent to seek Buck's designation as a persistent felony offender, noting that he had been released from prison less than five years before committing the charged offenses. In April of 2003, the State amended the Information to include a charge of burglary, pursuant to § 45-6-204(1), MCA, and an allegation that Buck

3

had used a dangerous weapon in committing the deliberate homicide--an act separately punishable under § 46-18-221(1), MCA. Buck pled not guilty to all the charges.

¶13 Following the District Court's denial of four of his pre-trial motions, Buck filed an Application for Writ of Supervisory Control in May of 2003. We allowed the State an opportunity to respond regarding one issue, and denied the Application with regard to the other issues raised. Buck moved for dismissal of the Application after the outstanding issue was resolved in the District Court, and we issued an Order granting that request.

¶14 Buck waived his right to a speedy trial and a jury was convened on August 8, 2003. On the evening of the final day of trial, August 15, the jury found Buck guilty of the offenses of deliberate homicide and burglary, and found that Buck had used a weapon in committing the homicide.

¶15 In rendering Buck's sentence, the District Court stated, *inter alia*:

> Given his prior criminal history, his repeated pattern of violence, drug abuse, and probation violations, the nature of the instant offenses, and his continued violent behavior while in jail, there is little, if any, realistic prospect for the Defendant's rehabilitation and safe return to a community setting. The safety of this community, and society in general, require a sentence that will guarantee the Defendant's incarceration for the remainder of his life.

¶16 The court designated Buck as a persistent felony offender[1] and sentenced him to a life term, plus fifty years, at the Montana State Prison. Specifically, the court sentenced Buck to a term of life imprisonment upon his conviction for the offense of deliberate homicide; a consecutive term of ten years for his use of a weapon in the commission of the deliberate

---

[1] The court imposed this designation based on the fact that Buck was released from prison within five years of his commission of the instant offenses. He was serving time pursuant to a conviction for felony theft.

4

homicide; a consecutive term of twenty years upon his conviction of the offense of burglary; and a consecutive term of twenty years upon his designation as a persistent felony offender. Additionally, the court specified that Buck would not be eligible for parole or participation in any type of supervised release program during the entirety of his sentences.

¶17 On appeal, Buck does not challenge the sufficiency of the evidence upon which his conviction was based. He does, however, seek a new trial based on seven alleged errors.

## DISCUSSION

¶18 **1. Did the District Court err in denying Buck's Motion to Suppress?**

¶19 Upon request by law enforcement, Buck voluntarily went to the Kalispell Police Department headquarters on November 2, 2002. Before any questioning commenced, Buck was advised of his *Miranda* rights. Buck also signed a form acknowledging his understanding of these rights. Buck then willingly spoke with Lieutenant Greg Burns (Burns) and Detective Sergeant Roger Nasset (Nasset) for several hours, during which time Buck denied any responsibility in Evans' death. During this initial interrogation, Buck did not request counsel, and no counsel was present on his behalf.

¶20 After the interrogation was terminated, Buck was arrested on a probation violation, as a suspect in the investigation of Evans' homicide. At this stage, Burns sought to obtain a scraping of Buck's fingernails. The following discussion was preserved by audio-video recording:

> Lt. Burns: Joe, before you, uh, head down to the jail, there's one other thing I'd like to do -- it's, uh, just to get a scraping of your fingernails, or, I clean your fingernails.
>
> Buck: Oh.

5

| | |
|---|---|
| Lt. Burns: | Okay?  Do you have any problem with that?  This is a permission to search form that we use when we get something like that. |
| Buck: | Um, um, I don't know.  Um, maybe I need to talk to a lawyer or something.  I don't know. |
| Lt. Burns: | Do you have a question about this? |
| Buck: | Well, yeah, um, ya know. |
| Lt. Burns: | Go ahead, I'll fill it out, you can read it and decide if you have a question.  Maybe it will help you decide -- know what I mean? |
| Buck: | Yeah, its, I'll just wait and talk to a lawyer. |
| Lt. Burns: | You want to wait?  You don't want to do this? |
| Buck: | Yeah, I'll just -- |
| Lt. Burns: | All right, I understand. |

The discussion ended at this point.  Buck was not appointed counsel and Burns did not take a fingernail scraping.  Buck was then transported to the Flathead County Detention Center.  While in custody, several days later, Buck declined to call an attorney after Officer Mike Cooper explicitly offered him the opportunity to do so.[2]

¶21    On November 8, while still in custody, Buck was transported to the police station where he agreed to another interrogation with Burns and Nasset.  Before this session commenced, Buck was again advised of his *Miranda* rights, and he again signed a form acknowledging his understanding of these rights.

¶22    During this interrogation, which was preserved by audio-video recording, Buck did not request counsel, and no counsel was present on his behalf.  Buck initially denied any

---

[2]  Buck testified that he appeared before Judge Ortley sometime after his arrest and before the second interrogation.  At this time, Buck testified, Michael Keedy was appointed to represent him regarding his probation violation.  Buck also testified that he called Michael Keedy's office before the second interrogation, but was unable to secure representation. Nothing in the record before us explains or verifies any portion of these seemingly conflicting statements.  Moreover, Buck does not present any argument regarding the issue of whether an attorney was actually appointed for him before the second interrogation, or the

involvement in Evans' death. Eventually, however, after viewing videotaped statements of witnesses, Buck admitted entering Evans' house on the morning in question. He then stated that he had encountered Evans and beat him repeatedly. Thereafter, Buck stated he tied Evans' hands behind his back and placed tape over his eyes. He also stated that Evans "was cussing and yelling and screaming," but stated he thought Evans "was okay when [he] left." During this discussion, Buck repeatedly stated that he had not intended to kill Evans. Finally, Buck stated, *inter alia*, that he left the house with a pair of Evans' shoes and an unspecified amount of cash which he found in a drawer. Nasset then sought and received verbal confirmation from Buck that he had made these statements of his "own free will."

¶23     In March of 2003, Buck filed a Motion seeking to suppress his confession. In his brief supporting the Motion, Buck argued that his confession was obtained illegally because the law enforcement officers did not honor his request for counsel before the second interrogation. The State filed a response, arguing that Buck's confession was obtained legally because his request for counsel was limited to the bodily search Burns had proposed, and because he waived his *Miranda* rights before the second interrogation.

¶24     The District Court held a suppression hearing in May of 2003. At this hearing, the court viewed the audio-video recording of the discussion between Buck and Burns, noted above, wherein Buck declined to undergo a fingernail scraping without first consulting a lawyer. Burns testified that he believed Buck's statements regarding "a lawyer" were made in response to the request for a fingernail scraping. Buck testified that he understood the

issue of whether an attorney appointed for him pursuant to a probation violation should have been present at the second interrogation. Thus, we do not consider these questions.

7

form he had signed which advised him of his rights. He also testified that he understood his right to have counsel present before being questioned, and that he understood his right to terminate a police interrogation and request counsel.

¶25     In rendering its ruling, the District Court stated:

> Clearly, from the evidence that's been presented to me today, during the course of interrogation Mr. Buck never asked for a lawyer, in fact he waived such twice in writing after having -- provided his signature after having been advised. His mention of a lawyer with the statement "maybe I need to talk to a lawyer or something" on November 2nd was clearly after the interrogation had stopped, and in the Court's mind in direct response to Lieutenant Burns' question -- or request for a fingernail scraping, a search of his person. When Mr. Buck made that statement the search did not occur, nor did any further interrogation occur at that time, it had ceased.
> And, again, I want to emphasize, it appears clear to the Court that Mr. Buck's comment was in direct response to the request from Officer Burns for a scraping.

Upon these findings, the District Court denied Buck's Motion to Suppress.

¶26     At trial, the prosecutor informed the court that he would not play the recording of Buck's confession for the jury because it contained "a whole range of things, including prior crimes, prior methamphetamine use, his time in prison, and that stuff is clearly not properly presented to the jury." Accordingly, the prosecution presented Buck's confession to the jury through Nasset's testimony. The State also presented similar evidence through Joel Kelley, a friend of Buck's, and Jonathan Keys, Buck's cousin. Both of these individuals testified that shortly after Evans' death, Buck told them that he had attacked Evans.

¶27     On appeal, Buck claims that the District Court erred in denying his Motion to Suppress. Despite the District Court's finding to the contrary, Buck claims that his references to a lawyer occurred before the first interrogation was terminated. Similarly, Buck

8

asserts that his references to a lawyer "merely coincided" with Burns' request to conduct a bodily search, despite the District Court's finding that Buck's statements were made in direct response to Burns' request. Buck also asserts that he was not capable, based on his education, of distinguishing between a request for counsel for the interrogation, and a request for counsel for the purposes of a bodily search. Finally, Buck argues that his references to a lawyer were not limited to the bodily search which Burns sought to conduct, but were sufficient to invoke his right to counsel in custodial interrogation. Upon these contentions, Buck argues that the law enforcement officers violated his right to counsel when they conducted the second interrogation without counsel present on his behalf.

¶28    Before addressing these arguments, we note two additional arguments which do not merit resolution here. First, Buck argues, in conclusory fashion, that counsel should have immediately been appointed for him pursuant to his probation violation. We will not address this argument because Buck fails to support it with analysis or citation to legal authority, as required by Rule 23(a)(4), M.R.App.P. *State v. Lynch*, 2005 MT 337, ¶ 14, 330 Mont. 74, ¶ 14, 125 P.3d 1148, ¶ 14. Second, Buck argues that his confession was involuntary because Nasset utilized "the coercive technique known as the Reid technique" in the interrogation. Buck states that this technique requires the interrogating officer to lie to the suspect, and claims that it has "generated many false confessions." Buck also notes that Nasset admitted lying to him during the interrogation, and he claims that this technique violated his right to due process and his right to a fair trial. However, Buck does not specify any particular lie in his brief. Moreover, Buck cites no legal authority in support of his argument. Again, we will

9

not address this argument because Buck fails to support it with analysis or citation to legal authority, as required by Rule 23(a)(4), M.R.App.P. *Lynch*, ¶ 14. As we have stated, this Court is not obligated to conduct legal research on an appellant's behalf or develop legal analysis that may lend support to his or her position. *State v. Zakovi*, 2005 MT 91, ¶ 28, 326 Mont. 475, ¶ 28, 110 P.3d 469, ¶ 28 (citing *Johansen v. State, Dept. of Natural Resources*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24). We do note, however, that this Court does not condone the use of lies and deceit to gain a confession or admission from an individual in custodial interrogation, as these practices may render a confession involuntary. *State v. Reavley*, 2003 MT 298, ¶¶ 16, 43, 318 Mont. 150, ¶¶ 16, 43, 79 P.3d 270, ¶¶ 16, 43.

¶29 We review a district court's ruling on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Ochadleus*, 2005 MT 88, ¶ 16, 326 Mont. 441, ¶ 16, 110 P.3d 448, ¶ 16 (citing *State v. Lanegan*, 2004 MT 134, ¶ 10, 321 Mont. 349, ¶ 10, 91 P.3d 578, ¶ 10). A district court's findings are clearly erroneous if they are not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Ochadleus*, ¶ 16 (citing *Lanegan*, ¶ 10).

¶30 We first address Buck's challenges to the District Court's factual findings. The court found that Buck's statements regarding a lawyer were made "clearly after the interrogation had stopped." Buck contradicts this finding, claiming that his statements occurred during the first interrogation. However, Buck fails to provide any explanation as to how the court may

10

have erred. The audio-video recording before us fully supports the court's finding. It shows that Buck was in a holding area, rather than the interrogation room, when Burns sought to conduct a fingernail scraping. It also shows that this discussion took place while Buck was being processed for transportation to the detention center. The court also found that Buck's statements regarding a lawyer were made "in direct response" to Burns' request to conduct a fingernail scraping. Buck contradicts this finding, asserting that his statements "merely coincided" with Burns' request. Here again, Buck fails to provide any explanation as to how the court may have erred, and the audio-video recording before us fully supports the court's finding. It is well settled that a district court's decision is presumed correct and an appellant bears the burden of establishing error. *State v. Aakre*, 2002 MT 101, ¶ 43, 309 Mont. 403, ¶ 43, 46 P.3d 648, ¶ 43 (citing *In re M.J.W.*, 1998 MT 142, ¶ 18, 289 Mont. 232, ¶ 18, 961 P.2d 105, ¶ 18). Here, Buck's cursory arguments fail to demonstrate that the court's factual findings were clearly erroneous. Accordingly, based on the court's findings and the evidence before us, we proceed on the assumption that the first interrogation ended before Burns sought to conduct a fingernail scraping and, therefore, before Buck made any reference to a lawyer. We also assume that Buck's request for counsel was made in direct response to Burns' request to conduct a fingernail scraping.

¶31   Buck also claims that he was not capable of distinguishing between a request for counsel for the interrogation, and a request for counsel for the purposes of a bodily search. Buck cites no evidence demonstrating that he did not understand his rights. Rather, he relies on the fact that he did not advance beyond ninth grade in school. Buck also asserts that he is

11

"a layperson . . . uneducated in constitutional principle and legal nicety." *See State v. Johnson* (1986), 221 Mont. 503, 514, 719 P.2d 1248, 1255 (holding that "precise words" need not be uttered to invoke the right to counsel, upon the recognition that "[l]ay people are not learned in constitutional principle nor legal nicety"). We find no merit in Buck's argument. While we acknowledge that some individuals indeed may be unable to understand the import of making a request for counsel in two different contexts, Buck has not demonstrated such an infirmity. In fact, Buck testified at the suppression hearing that he did understand his right to counsel. As we have held, an appellant bears the burden of establishing error. *Aakre*, ¶ 43 (citing *In re M.J.W.*, ¶ 18). Here, Buck's cursory argument fails to meet that burden.

¶32 Before addressing Buck's remaining argument, we review the law governing the admissibility of confessions obtained in custodial interrogation. In doing so, we address an incongruity in our case law on this subject.

¶33 The Sixth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell* (1993), 506 U.S. 364, 368, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (citing *Strickland v. Washington* (1984), 466 U.S. 668, 684, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674). This right is triggered at or after the time that judicial proceedings have been initiated, whether by way of

12

formal charge, preliminary hearing, indictment, information, or arraignment. *Fellers v. United States* (2004), 540 U.S. 519, 523, 124 S.Ct. 1019, 1022, 157 L.Ed.2d 1016 (citing *Brewer v. Williams* (1977), 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424). Absent a knowing and intelligent waiver of the Sixth Amendment right to counsel, no person may be imprisoned for any offense unless he or she was represented by counsel at trial. *Alabama v. Shelton* (2002), 535 U.S. 654, 662, 122 S.Ct. 1764, 1770, 152 L.Ed.2d 888 (citing *Argersinger v. Hamlin* (1972), 407 U.S. 25, 37, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530).

¶34     The Fifth Amendment to the United States Constitution, made applicable to the States by Fourteenth Amendment, *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  The United States Supreme Court has characterized this privilege against compulsory self-incrimination as "the mainstay of our adversary system of criminal justice." *Johnson v. New Jersey* (1966), 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882.  The Court has also stated that this privilege constitutes

> an important advance in the development of our liberty . . . .  It reflects many of our fundamental values and most noble aspirations:  our . . . preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load, . . . and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent. . . .
>     Most, if not all, of these policies and purposes are defeated when a witness can be whipsawed into incriminating himself . . . .

13

*Murphy v. Waterfront Comm'n of New York Harbor* (1964), 378 U.S. 52, 55, 84 S.Ct. 1594, 1596-97, 12 L.Ed.2d 678 (internal quotes, citations, and footnote omitted).

¶35    In *Miranda v. Arizona* (1966), 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, the United States Supreme Court established "procedural safeguards" to secure the privilege against compulsory self-incrimination. *Miranda* requires that the following warnings must be stated to a suspect prior to custodial interrogation:[3] he must be warned that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to consult with an attorney and to have the attorney present with him during interrogation; and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.[4] *Miranda*, 384 U.S. at 473, 478-79, 86 S.Ct. at 1627, 1630.

¶36    In announcing this rule, the Court stated:

> We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

---

[3]    The Court specified: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

[4]    The Court recognized that lawmakers could devise alternative procedures to protect the privilege against compulsory self-incrimination, but stated "unless we are shown other procedures which are at least as effective in apprising accused persons of their right of

14

¶37     Additionally, the Court specified that a suspect must be allowed to exercise his rights throughout an interrogation, and stated:

> After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630.

¶38     Finally, the Court announced that the right to have counsel present at a custodial interrogation "is indispensable to the protection of the Fifth Amendment privilege" against compulsory self-incrimination. *Miranda*, 384 U.S. at 469, 86 S.Ct. at 1625. In doing so, the Court established what has come to be known as the "Fifth Amendment right to counsel," or the "*Miranda* right to counsel." *McNeil v. Wisconsin* (1991), 501 U.S. 171, 173-84, 111 S.Ct. 2204, 2206-12, 115 L.Ed.2d 158.

¶39     The Supreme Court's precedent recognizes a distinction between the right to counsel for the purpose of defending against charges, as provided for in the Sixth Amendment, and the right to counsel in custodial interrogation for the purpose of securing the Fifth Amendment privilege against compulsory self-incrimination. For example, the Court has stated:

> The purpose of the Sixth Amendment counsel guarantee--and hence the purpose of invoking it--is to protect the unaided layman at critical confrontations with his expert adversary, the government, *after* the adverse positions of government and defendant have solidified with respect to a particular alleged crime. The purpose of the *Miranda-Edwards* guarantee, on the other hand--and hence the purpose of invoking it--is to protect a quite

silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

different interest: the suspect's desire to deal with the police only through counsel. This is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding *any* suspected crime and attaches whether or not the "adversarial relationship" produced by a pending prosecution has yet arisen). To invoke the Sixth Amendment interest is, as a matter of *fact*, *not* to invoke the *Miranda-Edwards* interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution.

*McNeil*, 501 U.S. at 177-78, 111 S.Ct. at 2208-09 (internal quotes and citations omitted). *See also Patterson v. Illinois* (1988), 487 U.S. 285, 297, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 ("While our cases have recognized a difference between the Fifth Amendment and Sixth Amendment rights to counsel, and the policies behind these constitutional guarantees, we have never suggested that one right is superior or greater than the other, nor is there any support in our cases for the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart.") (internal quotes and footnote omitted); *Michigan v. Jackson* (1986), 475 U.S. 625, 633 n.7, 106 S.Ct. 1404, 1409 n.7, 89 L.Ed.2d 631 ("Although judges and lawyers may understand and appreciate the subtle distinctions between the Fifth and Sixth Amendment rights to counsel, the average person does not.") (citation omitted).

¶40	Montana's counterpart to the Sixth Amendment right to counsel is contained in Article II, Section 24, of the Montana Constitution, which provides that "[i]n all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel . . . ." Montana's counterpart to the Fifth Amendment privilege against compulsory self-incrimination is contained in Article II, Section 25, of the Montana Constitution, which

16

provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding."

¶41    In *State v. Johnson* (1986), 221 Mont. 503, 719 P.2d 1248, this Court established that the right to counsel in custodial interrogation may be invoked without the use of the words "attorney" or "lawyer."  In *Johnson*, one Deputy Peterson found Johnson in a disabled car on Interstate 90 near East Missoula.  *Johnson*, 221 Mont. at 506, 719 P.2d at 1250.  Peterson spoke with Johnson and perceived that he was intoxicated.  *Johnson*, 221 Mont. at 506, 719 P.2d at 1250.  After administering several field sobriety tests which Johnson either refused or was unable to perform, Peterson arrested Johnson and placed him in the patrol car.  *Johnson*, 221 Mont. at 506, 719 P.2d at 1250.  Peterson stated that he would record Johnson's statements and then advised him of his *Miranda* rights.  *Johnson*, 221 Mont. at 506, 719 P.2d at 1250.  The following conversation ensued:

| | |
|---|---|
| Mr. Johnson: | Yes I understand.  Do I have the right to address somebody? |
| Deputy Peterson: | Yeah.  In just a second, okay.  I have got a tape recorder on.  Everything you say from this time -- |
| Mr. Johnson: | I understand that. |
| Deputy Peterson: | -- is going to be tape recorded.  Okay. |
| Mr. Johnson: | I would like to talk to somebody. |
| Deputy Peterson: | It is 2:01 a.m. on December 8, 1983, Thursday morning, okay? |
| Mr. Johnson: | You have an advantage because my hands are handcuffed and I would like to talk to somebody. |
| Deputy Peterson: | You would like to -- who do you want to talk to? |
| Mr. Johnson: | I am not, I haven't decided yet. |
| Deputy Peterson: | Okay. |
| Mr. Johnson: | This is dirty pool you guys.  God Almighty.  Hey, am I off the record here? |
| Deputy Peterson: | No, you are on the record.  You are on tape Richard. |

17

¶42 Peterson recorded the subsequent conversation, in which Johnson stated, *inter alia*, that he had been driving the car. *Johnson*, 221 Mont. at 507-08, 719 P.2d at 1251. Johnson sought to suppress his recorded statement, but the district court ruled that it was admissible. *Johnson*, 221 Mont. at 510-11, 719 P.2d at 1253. At the conclusion of his trial, Johnson was convicted of driving or being in control of a motor vehicle on a public way while under the influence of alcohol. *Johnson*, 221 Mont. at 510, 719 P.2d at 1252.

¶43 On appeal, this Court concluded that Johnson had invoked his right to counsel when he asked if he had "the right to address somebody" and subsequently stated that he "would like to talk to somebody." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. The Court stated:

> The implication of asking to speak to "someone" immediately after the reading of one's rights is that "someone" refers to a legal advisor. Lay people are not learned in constitutional principle nor legal nicety. To require precise words be uttered would elevate form over substance.

*Johnson*, 221 Mont. at 514, 719 P.2d at 1255.

¶44 In reaching this conclusion, this Court stated "we refuse to 'march lock-step' with the United States Supreme Court where constitutional issues are concerned, even if the applicable State Constitution provisions are identical or nearly identical to those of the United States Constitution." *Johnson*, 221 Mont. at 512, 719 P.2d at 1254. This Court also stated "[a]dequate and independent state grounds exist in our own Constitution and statutes to resolve this matter." *Johnson*, 221 Mont. at 513, 719 P.2d at 1255. Ultimately, this Court concluded:

> The taped conversation should not have been admitted during the State's case-in-chief. However, because that conversation could have been used by the State to impeach defendant's testimony at trial, we find the error in

18

> admitting the tape to be harmless. . . . [O]nce defendant testified to a story different than that upon which he previously relied, defendant "opened the door" to the admissibility of the illegally-obtained evidence for impeachment purposes.

*Johnson*, 221 Mont. at 515, 719 P.2d at 1255-56 (citation omitted).

¶45    In considering Montana's privilege against compulsory self-incrimination for the purposes of resolving the case *sub judice*, we find it necessary to address an incongruity in *Johnson*. The *Johnson* Court held that "when defendant asked, immediately after having been read his rights, if he had the right to address somebody and subsequently stated that he would like to talk to somebody, he invoked *his right to counsel under Art. II, Section 24 of the Montana Constitution*." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255 (emphasis added). However, Article II, Section 24, provides for the right to counsel in "criminal prosecutions." This right is distinct from the right to counsel in custodial interrogation, which exists to secure the privilege against compulsory self-incrimination provided for in Section 25. *See McNeil*, 501 U.S. at 177-78, 111 S.Ct. at 2208-09; *Miranda*, 384 U.S. at 469, 86 S.Ct. at 1625.

¶46    We perpetuated this error in *State v. Spang*, 2002 MT 120, 310 Mont. 52, 48 P.3d 727, another case where we considered whether a suspect had invoked the right to counsel in custodial interrogation. We set out on the right path when we recognized that the *Miranda* right to counsel in custodial interrogation serves to protect the Fifth Amendment privilege against compulsory self-incrimination, *Spang*, ¶ 20, which is mirrored in Article II, Section 25, of the Montana Constitution. However, we then inexplicably eschewed Section 25 when we relied on *Johnson* for the proposition that "the right to counsel afforded by Article II,

19

Section 24, of the Montana Constitution is broader than the rights afforded by the United States Constitution." *Spang*, ¶ 22. Ultimately, our decision improperly identified the Section 24 right to counsel in "criminal prosecutions" as the right which Spang invoked in his custodial interrogation. *Spang*, ¶¶ 20-25.

¶47 It is clear that *Johnson* and *Spang* erroneously conflated the Section 25 privilege against compulsory self-incrimination, and its attendant right to counsel in custodial interrogation, with the Section 24 right to counsel in "criminal prosecutions." Of course, a suspect can no more invoke the Section 24 right to counsel at the time of a custodial interrogation than he can invoke the right to trial by jury before being charged with a crime.

¶48 The right to counsel in custodial interrogation clearly exists only in relation to Section 25, because it serves to secure the privilege against compulsory self-incrimination provided for in Section 25. *See Miranda*, 384 U.S. at 469, 86 S.Ct. at 1625. It is not a sub-part of the Section 24 right to counsel, nor is it connected thereto in any way. Thus, to the extent that *Johnson* and *Spang* identified the Section 24 right to counsel as a right which may be invoked in custodial interrogation, they are hereby overruled. However, we do not reject the principal guidance provided in *Johnson*--i.e., that form shall not prevail over substance where invocation of the right to counsel in custodial interrogation is concerned. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. Stated another way, we still adhere to the rule that invocation of that right does not depend on the use of any particular words; rather, it depends on the evident purpose of the suspect's statement, as viewed in light of the circumstances and

20

in light of the rule that requests for counsel must be construed broadly. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255.

¶49 We now turn to Buck's primary contention--the argument that his references to a lawyer were not limited to the bodily search which Burns sought to conduct, but were sufficient to invoke his right to counsel in the subsequent custodial interrogation. Pursuant to *Johnson*, a suspect's statement evincing a general desire for assistance in dealings with law enforcement, even though vague and not containing a reference to legal counsel, is sufficient to invoke the right to counsel in custodial interrogation. *Johnson*, 221 Mont. at 506-14, 719 P.2d at 1250-55. Here, however, we face an entirely different type of statement than was uttered in *Johnson*. Buck specifically stated his desire to speak to "a lawyer," and did so solely with regard to his decision to decline or submit to the bodily search which Burns sought to conduct. Moreover, Buck's statements were made in an entirely different context than those which we considered in *Johnson*. Here, Buck made his statements regarding "a lawyer" after he had earlier declined to consult an attorney when the police informed him of his right to do so, and after he had willingly submitted to several hours of questioning.[5]

¶50 The resolution of this issue depends on the legal effect of Buck's statements made in response to Burns' request to conduct a fingernail scraping. As we have no Montana precedent on point, we look to *Connecticut v. Barrett* (1987), 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920, wherein the United States Supreme Court considered a defendant's "limited"

---

[5] We do not reach the issue of whether Buck's first interrogation was in fact "custodial" because neither party presents argument in this regard. However the first interrogation may be technically characterized, it is undisputed that Buck clearly indicated his willingness to speak with the police at that time without consulting an attorney.

21

invocation of the right to counsel. In *Barrett*, the Court reaffirmed the principle that a request for counsel must be broadly construed. *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832 (citing *Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409). However, the Court also indicated that an individual may invoke his or her right to counsel for limited purposes. *Barrett*, 479 U.S. at 527-30, 107 S.Ct. at 831-32.

¶51　While in police custody as a suspect in a sexual assault, Barrett was advised of his *Miranda* rights and signed a form acknowledging that fact. *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. Barrett then stated that "he would not give the police any written statements but he had no problem in talking about the incident." *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. Approximately thirty minutes later, Barrett was again advised of his *Miranda* rights and signed a form acknowledging that fact. *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. Barrett "stated that he understood his rights, and told the officers that he would not give a written statement unless his attorney was present but had 'no problem' talking about the incident." *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. During the subsequent interrogation, in the absence of counsel, Barrett gave an oral statement admitting his involvement in the sexual assault. *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. Officers conducted a second interrogation after discovering that the tape recorder used to preserve Barrett's statement had malfunctioned. *Barrett*, 479 U.S. at 525-26, 107 S.Ct. at 830. Barrett was again advised of his *Miranda* rights and he again declared his willingness to talk about the incident, but stated that "he did not want to put anything in writing until his attorney came." *Barrett*, 479 U.S. at 526, 107 S.Ct. at 830. Barrett then repeated his confession. *Barrett*, 479 U.S. at 526, 107

22

S.Ct. at 830. Upon discovering that the tape recorder had again malfunctioned, an officer created a written record of his recollection of Barrett's statement. *Barrett*, 479 U.S. at 526, 107 S.Ct. at 830.

¶52 Barrett moved to suppress his confession, claiming that his right to counsel had been violated. *Barrett*, 479 U.S. at 526, 107 S.Ct. at 830; *State v. Barrett* (Conn. 1985), 495 A.2d 1044, 1046-47. The trial court ruled that Barrett's confession was admissible. *Barrett*, 479 U.S. at 526, 107 S.Ct. at 830. Following a jury trial, Barrett was convicted of sexual assault, unlawful restraint, and possession of a controlled substance. *Barrett*, 479 U.S. at 525, 107 S.Ct. at 830. The Connecticut Supreme Court reversed and remanded for a new trial. *Barrett*, 479 U.S. at 526, 107 S.Ct. at 830; *Barrett*, 495 A.2d at 1050. Noting that requests for counsel are not narrowly construed, the court concluded that Barrett's expressed desire for counsel before making a written statement served as an invocation of the right *for all purposes*. *Barrett*, 479 U.S. at 526-27, 107 S.Ct. at 830-31.

¶53 The United States Supreme Court reversed the judgment of the Connecticut Supreme Court. *Barrett*, 479 U.S. at 530, 107 S.Ct. at 833. In doing so, the Court observed that "Barrett made clear to police his willingness to talk about the crime for which he was a suspect." *Barrett*, 479 U.S. at 527, 107 S.Ct. at 831. The Court also stated that "Barrett's limited requests for counsel . . . were accompanied by affirmative announcements of his willingness to speak with the authorities. . . . *Miranda* gives the defendant a right to choose

between speech and silence, and Barrett chose to speak."[6] *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832.

¶54    The Court reiterated that requests for counsel must be broadly interpreted. *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832 (citing *Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409). However, the Court also stated that

> [i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous. Here, however, Barrett made clear his intentions, and they were honored by police. To conclude that respondent invoked his right to counsel *for all purposes* requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of respondent's statement.

*Barrett*, 479 U.S. at 529-30, 107 S.Ct. at 832 (emphasis added, footnote omitted).

¶55    The Georgia Supreme Court has applied *Barrett* in a situation closely analogous to the case *sub judice*. In *Baird v. State* (Ga. 1994), 440 S.E.2d 190, the defendant was stopped by a deputy sheriff while driving an automobile matching the description of a vehicle identified in connection with a murder investigation. After discovering outstanding arrest warrants against Baird, the deputy placed him under arrest. *Baird*, 440 S.E.2d at 191. Minutes later, police officers arrived at the scene and advised Baird of his *Miranda* rights. *Baird*, 440 S.E.2d at 191. Baird agreed to speak to the police, but he was not interrogated at that time. *Baird*, 440 S.E.2d at 191. Shortly thereafter, the police sought to search Baird's vehicle. *Baird*, 440 S.E.2d at 191. Initially, Baird verbally consented to the search. *Baird*, 440 S.E.2d at 191. However, after an officer advised Baird that the search was to be conducted in

---

[6]  Because the attempts to record Barrett's statement were unsuccessful, the Court did not consider "whether the result would be different if police had taped the statements and used the recording against Barrett." *Barrett*, 479 U.S. at 529 n.2, 107 S.Ct. at 832 n.2.

24

conjunction with the murder investigation, Baird stated "if this ha[s] to do with a murder investigation, [I] might ought to talk to a lawyer." *Baird*, 440 S.E.2d at 191. Then, another officer told Baird that he had been advised of his rights and asked if he would consent to a search of the vehicle. *Baird*, 440 S.E.2d at 191. At this point, Baird verbally consented to the search and signed a consent form. *Baird*, 440 S.E.2d at 191. The search of Baird's vehicle yielded a stolen pistol. *Baird*, 440 S.E.2d at 191.

¶56     After being transported to the police station, Baird was again advised of his *Miranda* rights and he again stated that he was willing to speak with the police. *Baird*, 440 S.E.2d at 192. He also stated that he did not want a lawyer. *Baird*, 440 S.E.2d at 192. When asked about his prior reference to a lawyer, Baird stated "that was when you asked me about searching the car. See I just didn't know how to handle that type thing. And see, I used to work for him and I, you know, I thought I'd -- I thought about calling him, but I don't guess it matters." *Baird*, 440 S.E.2d at 192. Baird then reiterated that he was willing to proceed with the interrogation without an attorney. *Baird*, 440 S.E.2d at 192. The interrogation was conducted and Baird made statements which he subsequently moved to suppress. *Baird*, 440 S.E.2d at 192. The trial court denied Baird's motion and the Georgia Supreme Court granted interim appellate review in order to review this issue, among others. *Baird*, 440 S.E.2d at 191-92.

¶57     On appeal, Baird argued that his reference to a lawyer served to invoke his Fifth Amendment right to counsel, and that the subsequent interrogation was therefore improper pursuant to *Miranda*. *Baird*, 440 S.E.2d at 192. In recognition of the similarities between

Baird's request for counsel and that of the defendant in *Barrett*, the court used language directly from *Barrett* in observing that Baird's "limited" request for counsel was "'accompanied by affirmative announcements of his willingness to speak with the authorities.'" *Baird*, 440 S.E.2d at 192 (quoting *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832).

¶58    Further, the court cited one of its previous cases for the proposition (originally derived from *Barrett*) that an individual "may make a limited request for counsel which the police are 'required to honor to no greater extent than the express limits of his reservation.'" *Baird*, 440 S.E.2d at 192 (citing *Pitts v. State* (Ga. 1989), 386 S.E.2d 351, 355). Finally, in rejecting Baird's argument, the court stated:

> [T]he record supports the trial court's finding that appellant's statement that he "might ought to talk to a lawyer," was made in response to the state's request to search his vehicle, and was not an assertion of his Fifth Amendment right to counsel during custodial interrogation. . . . At most, appellant's reference to counsel was a limited request for an attorney to be present solely during the search of his car, an issue not before us in this appeal.

*Baird*, 440 S.E.2d at 192.

¶59    The Arizona Court of Appeals has also applied *Barrett* in another situation closely analogous to the case *sub judice*. In *State v. Uraine* (Ariz. Ct. App. 1988), 754 P.2d 350, the defendant was stopped by a police officer who observed him driving erratically after leaving the parking lot of a bar. The officer arrested Uraine after he failed field sobriety tests. *Uraine*, 754 P.2d at 350. Uraine agreed to answer questions after being advised of his *Miranda* rights at the police station. *Uraine*, 754 P.2d at 350. The officer then informed Uraine of the implied consent law, after which Uraine "stated that he did not want to take the breath test until he talked to his lawyer." *Uraine*, 754 P.2d at 350. In the subsequent

26

interrogation, Uraine made statements which he later sought to suppress. *Uraine*, 754 P.2d at 350. The trial court refused to suppress these statements, concluding that Uraine's "request to talk to counsel was, in effect, a limited request to see an attorney before he decided whether or not he would take a breath test." *Uraine*, 754 P.2d at 351. Following a jury trial, Uraine was convicted of "driving while under the influence of intoxicating liquor while his license was revoked." *Uraine*, 754 P.2d at 350.

¶60    On appeal, Uraine argued that he had invoked his right to counsel when he stated his desire to speak with an attorney before taking a breath test. *Uraine*, 754 P.2d at 350-51. Accordingly, Uraine argued that all questioning should have ceased at that point. *Uraine*, 754 P.2d at 351. The Arizona Court of Appeals affirmed Uraine's conviction, stating that "as in *Barrett*, the invocation of [Uraine's] right to counsel was a limited one." *Uraine*, 754 P.2d at 351. Noting that Uraine specifically stated he understood the *Miranda* warnings and agreed to answer questions, the court concluded that his "limited invocation of the right to counsel did not operate as a request for counsel for all purposes . . . ." *Uraine*, 754 P.2d at 351.

¶61    In Montana, as noted above, the right to counsel in custodial interrogation is broad enough that it may be invoked, in certain circumstances, by a vague statement which does not include reference to a lawyer. *Johnson*, 221 Mont. at 506-14, 719 P.2d at 1250-55. However, it is not so broad that it may be invoked by a request which is unambiguously limited to another police procedure. To conclude otherwise would require "not a broad

27

interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [a suspect's] statement." *See Barrett*, 479 U.S. at 529-30, 107 S.Ct at 832.

¶62 We recognize that a suspect may seek legal assistance for only limited purposes in his or her dealings with law enforcement. Based upon this recognition, and pursuant to *Barrett*, we hold that a suspect's request for counsel which is unambiguously limited to a police procedure that does not involve verbal inquiry, does not constitute an invocation of the right to counsel in custodial interrogation. Rather, a clearly limited request is properly construed according to its plain meaning, assuming that the suspect fully understands his or her right to counsel.

¶63 Of course, no suspect has an affirmative obligation to explain precisely why he or she wants legal assistance. Yet, when a suspect does clearly seek counsel for only limited purposes, the law will respect the limited nature of the request. After all, our legal system does not force a lawyer upon a suspect. *See Iowa v. Tovar* (2004), 541 U.S. 77, 87-88, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (citation omitted). However, if there is any reasonable doubt as to whether a suspect's request for counsel is limited to only certain aspects of his or her interaction with investigating officers, the request must be construed as an invocation of the right to counsel in custodial interrogation.

¶64 Thus, in following the rationale of *Barrett*, we do not dilute the well-established principle that a suspect's requests for counsel must be construed broadly. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255; *Barrett*, 479 U.S. at 529, 107 S.Ct at 832. We merely

conclude that literal interpretation of an unambiguous request for limited legal assistance does not undermine the right to counsel in custodial interrogation.

¶65    As did the defendants in *Baird* and *Uraine*, Buck sought legal counsel with regard to one particular police procedure, but also clearly expressed a willingness to speak to the officers.  It is undisputed that Buck was fully advised of his right to remain silent and his right to counsel in custodial interrogation.  It is also undisputed that he waived these rights knowingly and intelligently before both interrogations.  Moreover, while in custody before the second interrogation, Buck declined to contact an attorney after an officer explicitly gave him the opportunity to do so.  When Buck expressed a desire for legal assistance after the first interrogation was terminated, his statement was in direct response to Burns' request, and it was not ambiguous--i.e., he indicated that he would not submit to a bodily search without first consulting a lawyer.  Buck made no other statements suggesting that he sought legal assistance in any other aspect of his dealings with law enforcement.

¶66    To construe Buck's references to a lawyer as a request for counsel in custodial interrogation would require that we disregard the plain meaning of his statements and the context in which they were made.  Thus, we conclude that Buck's statements were unambiguously limited to the bodily search which Burns sought to conduct and, therefore, did not invoke his right to counsel in custodial interrogation.  Accordingly, we hold that the District Court did not err in denying Buck's Motion to Suppress.

¶67    **2.  Did the District Court err in denying Buck's Motion *in Limine* seeking to exclude evidence of his methamphetamine use?**

¶68 On the first day of trial, Buck filed a Motion *in Limine* seeking to exclude testimony regarding his use of methamphetamine. In support of this Motion, Buck asserted that such testimony would not be relevant. Buck cited to Rules 401, 402, and 403, M.R.Evid., but presented no analysis regarding the issue of relevance. Buck also observed that the State had not provided notice of its intent to present such testimony.

¶69 The State filed a memorandum opposing Buck's Motion. In doing so, the State asserted that Buck was under the influence of methamphetamine at the time he committed the charged offenses. The State then argued that it was entitled to present this evidence without prior notice, stating that Buck's "use of methamphetamine in the hours preceding the Evans Burglary and Homicide, and the fact that he was under the influence of that drug at the time he committed those offenses, are inseparably related to the offenses charged."

¶70 On the second day of trial, the District Court considered Buck's Motion in chambers, hearing argument from Buck's counsel, Mark Sullivan, and the prosecutor, Edward Corrigan. The following colloquy occurred:

> Mr. Corrigan: ... It is not my intention to explore Mr. Buck's methamphetamine addiction or his past use of [methamphetamine]. I intend only to elicit testimony that he and his friends ingested the drug on the night of the homicide and that he, by his own admissions, was under the influence of the drug at the time that Mr. Evans was killed. As I state in my response ... *evidence of other crimes that are inextricably or inseparably connected to the crime charged are admissible* even without the necessity of -- of prior notice under Just. *It's part of the same transaction*, corpus delicti -- if that's the right phrase ... it's part -- part of what happened that night, Judge, and the jury should hear it.
>
> The Court: Okay. Mark, do you have anything else?

30

| | |
|---|---|
| Mr. Sullivan: | . . . [I]t's simply not relevant . . . the prejudicial value of any evidence regarding use of methamphetamine far outweighs any probative value it might have. I think the probative value, if any, is extremely limited, and the prejudicial effect is great, therefore, I think it should be excluded. |
| The Court: | Okay. Well, I'm going to deny the motion in limine . . . the jury can and undoubtedly should -- or will be instructed that the Defendant is not charged with an offense of possessing or using methamphetamine. But if there is evidence that it was used and was an integral part of the charged offenses, namely, the homicide and the burglary, then I think it's relevant and admissible. And so it will be -- evidence concerning it will be admissible on that basis, but the jury will be advised -- or instructed that, if you wish, you know, and if you submit appropriate instructions, that it's not an offense with which he's charged. |

(Emphasis added.) At trial, Justin Dutton, a friend of Buck, testified that he and Jonathan Keys joined up with Buck on the evening of October 24, 2002, and drove to Whitefish where they obtained methamphetamine. Dutton testified that he observed Buck ingest methamphetamine sometime after 11:00 p.m., that evening. Dutton also testified that based on his own experience, a "crank high" lasts from half a day to a day. Jonathan Keys also testified, corroborating Dutton's testimony regarding the group's trip to Whitefish that evening to obtain methamphetamine. Keys clearly indicated that Buck ingested methamphetamine that evening, but testified that he did not personally see Buck do so. Finally, Nasset testified that Buck admitted, during the second interrogation, that he was under the influence of methamphetamine on the evening of Evans' death.

¶71 On appeal, Buck argues that the District Court erred when it admitted this testimony regarding his methamphetamine use because none of the procedural requirements of the

31

Modified *Just* Rule were followed, and because that evidence was both irrelevant and highly prejudicial. We review a district court's ruling regarding the admission of evidence of other crimes, wrongs, or acts under Rule 404(b), M.R.Evid., to determine whether the court abused its discretion. *Aakre*, ¶ 8.

¶72    Rule 404(b), M.R.Evid., provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court=s precedent supplements Rule 404(b), M.R.Evid., providing both procedural and substantive criteria for the admission of evidence of other crimes, wrongs, or acts. We first announced these criteria in *State v. Just* (1979), 184 Mont. 262, 268-69, 602 P.2d 957, 961 (citing *State v. Jensen* (1969), 153 Mont. 233, 239, 455 P.2d 631, 634[7]). Subsequently, we modified *Just* in *State v. Matt* (1991), 249 Mont. 136, 142, 814 P.2d 52, 56. Our holding in *Matt*, which incorporates the language of Rules 403 and 404(b), M.R.Evid., is currently referred to as the Modified *Just* Rule, and is to be used in determining admissibility of other crimes, wrongs, or acts. *State v. Ayers*, 2003 MT 114, & 73, 315 Mont. 395, & 73, 68 P.3d 768, & 73 (citing *Aakre*, & 9).

¶73    The following four criteria make up the substantive requirements of the Modified *Just* Rule:  (1) the other crimes, wrongs, or acts must be similar; (2) the other crimes, wrongs, or acts must not be remote in time; (3) the evidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show that he or she acted in conformity with such character, but it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; and (4) although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Ayers*, & 73 (citing *Aakre*, & 9). Each of these four criteria must be satisfied before evidence of prior crimes, wrongs, or acts is admissible. *Ayers*, & 76 (citing *Aakre*, & 9; *State v. Freshment*, 2002 MT 61, & 34, 309 Mont. 154, & 34, 43 P.3d 968, & 34).

¶74 Additionally, the following procedural requirements must be observed. *Ayers*, & 77 (citing *State v. Anderson* (1996), 275 Mont. 344, 349-50, 912 P.2d 801, 804). First, evidence of other crimes, wrongs, or acts may not be received unless there has been written notice to the defendant that such evidence is to be introduced. *Ayers*, & 77. The notice to the defendant shall specify the evidence of other crimes, wrongs, or acts to be admitted, and the specific purpose or purposes for which it is to be admitted. *Ayers*, & 77. Second, at the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish the jury to weigh the evidence only for such purposes. *Ayers*, & 77. Third, in its final charge, the court shall instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the

---

[7] Overruled in part on other grounds in *State v. Hansen*, 1999 MT 253, ¶¶ 37-39, 296 Mont.

defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment. *Ayers*, & 77.

¶75 As do many legal rules, the Modified *Just* Rule has an exception: evidence of acts which are inextricably or inseparably linked with the charged offense are admissible, notwithstanding the substantive and procedural criteria of the Modified *Just* Rule. *See State v. Davis* (1992), 253 Mont. 50, 59, 830 P.2d 1309, 1315 (citing *State v. Romero* (1986), 224 Mont. 431, 438, 730 P.2d 1157, 1162); *State v. Cameron* (1992), 255 Mont. 14, 21, 839 P.2d 1281, 1286 (citing *Romero*, 224 Mont. at 438, 730 P.2d at 1162); *State v. Byers* (1993), 261 Mont. 17, 34, 861 P.2d 860, 871[8] (citing *State v. Wolfe* (1991), 250 Mont. 400, 412, 821 P.2d 339, 346).

¶76 In *State v. Lozon*, 2004 MT 34, 320 Mont. 26, 85 P.3d 753, we observed that "a longstanding distinction exists between Rule 404(b) 'other crimes' evidence and evidence of a defendant's misconduct which is inseparably related to the alleged criminal act." *Lozon*, ¶ 12. We also associated the exception to the Modified *Just* Rule with the statutory "transaction rule," which provides:

> **Declaration, act, or omission which is a part of the transaction.** Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction.

---

282, ¶¶ 37-39, 989 P.2d 338, ¶¶ 37-39.
[8] Overruled in part on other grounds in *State v. Egelhoff* (1995), 272 Mont. 114, 125, 900 P.2d 260, 266, and *State v. Rothacher* (1995), 272 Mont. 303, 310, 901 P.2d 82, 86-87.

Section 26-1-103, MCA. Finally, we stated that "[p]ursuant to the 'transaction rule,' evidence of matters which are inextricably linked to, and explanatory of, the charged offense is admissible notwithstanding the rules relating to 'other crimes' evidence." *Lozon*, ¶ 12 (citing *State v. Hayworth*, 1998 MT 158, ¶¶ 31-32, 289 Mont. 433, ¶¶ 31-32, 964 P.2d 1, ¶¶ 31-32).

¶77 In *Lozon*, the defendant was convicted of felony criminal possession of dangerous drugs. *Lozon*, ¶ 1. During an early morning search of the room in which Lozon was living, his probation and parole officer discovered a vial which contained methamphetamine. *Lozon*, ¶ 3. After a police officer read Lozon his *Miranda* rights, Lozon stated that he had used methamphetamine in his room the previous evening. *Lozon*, ¶ 3. At trial, Lozon's probation and parole officer testified regarding this statement. *Lozon*, ¶ 5. On appeal, Lozon argued that the district court abused its discretion in allowing this testimony. *Lozon*, ¶ 9. In support of this argument, Lozon argued that his statement constituted evidence of other crimes, and that it was admitted in violation of the notice requirement of the Modified *Just* Rule. *Lozon*, ¶ 9.

¶78 We concluded that Lozon's statement was not "other crimes" evidence as contemplated by Rule 404(b), M.R.Evid. *Lozon*, ¶ 14. In doing so, we observed that the statement was "closely related to the charged offense of possession of dangerous drugs, and [was] explanatory of the circumstances surrounding the offense, because it establishe[d] his knowledge and possession of drugs in his room shortly prior to the early morning search." *Lozon*, ¶ 13. Accordingly, we held that the district court did not abuse its discretion in

35

allowing the testimony regarding Lozon's statement that he had used methamphetamine the night before his room was searched. *Lozon*, ¶ 14.

¶79 Here, the evidence of Buck's methamphetamine use is explanatory of the circumstances surrounding the charged offenses. Two witnesses indicated that Buck ingested methamphetamine within hours of the alleged offenses. Additionally, Nasset testified that Buck admitted being under the influence of methamphetamine on the evening of Evans' death. Thus, it appears that the evidence of Buck's methamphetamine use was not only relevant, but was inextricably and inseparably linked with the charged offenses and therefore not precluded by the Modified *Just* Rule.

¶80 We recognize that evidence of drug use is, by its very nature, prejudicial. *State v. Ingraham*, 1998 MT 156, ¶ 47, 290 Mont. 18, ¶ 47, 966 P.2d 103, ¶ 47 (citing *Simonson v. White* (1986), 220 Mont. 14, 23, 713 P.2d 983, 988). However, we also recognize that district courts have broad discretion in determining whether "other crimes" evidence is admissible under Rule 404(b), M.R.Evid. *Ayers*, ¶ 72 (citing *State v. Whitlow* (1997), 285 Mont. 430, 437, 949 P.2d 239, 244). Here, Buck's counsel offered no significant argument in challenging the introduction of the evidence at issue. He merely cited to several rules of evidence and asserted, in conclusory fashion and without supporting analysis, that the evidence was irrelevant and that its prejudicial value outweighed any probative value. Given the facts of this case, we can not conclude that the District Court erred in rejecting Buck's conclusory arguments.

¶81 We leave the foregoing discussion with a word of caution, however. We are *not* suggesting that evidence of methamphetamine use prior to an alleged crime is, without more, generally admissible. Absent other evidence establishing a probative linkage between the crime and the methamphetamine use and showing the effect of such use on the defendant, evidence of methamphetamine use may well be inadmissible under the "inseparably-related" exception to the Modified *Just* Rule or under the statutory "transaction rule," § 26-1-103, MCA. Here, the evidence of Buck's methamphetamine use shortly before the homicide, his admission that he was under the influence of that drug when he committed his crime, the brutal nature of the crime, and his failure to raise any significant challenge to the evidence, informs our conclusion that the District Court did not abuse its discretion in admitting the evidence.

¶82 We note that the court expressed a willingness to admonish the jury regarding properly limited consideration of the evidence of Buck's methamphetamine use. However, the record before us demonstrates that Buck's counsel did not act on the court's offer. We do not fault the District Court here. Yet, this Court has stated:

> [W]e encourage trial courts to apply the safeguards of *Just* liberally. Even though the procedures of *Just* may not be required in a given case, their use may be proper and wise. . . . The procedural safeguards were designed to protect those accused of crime from unfair surprise or double punishment. They should be liberally applied to that end.

*State v. Gillham* (1983), 206 Mont. 169, 179, 670 P.2d 544, 550. Although we made this statement before *Just* was modified by *Matt*, it is nonetheless applicable to the Modified *Just* Rule. Thus, we hereby encourage trial courts to liberally apply the procedural safeguards of

37

the Modified *Just* Rule. These safeguards are particularly important when evidence of drug use is introduced in cases where the defendant is not charged with drug use.

¶83    Finally, we note that some of the cases cited above refer to the doctrines of *corpus delicti* and *res gestae*. In *State v. Hansen,* 1999 MT 253, 296 Mont. 282, 989 P.2d 338, we characterized these terms as vague and imprecise, and we outlined misinterpretations and misuses of these doctrines in past cases. *Hansen*, ¶¶ 27-84, 96. As for the *corpus delicti* doctrine, we observed, *inter alia*, that it had "outlived its usefulness" and had been "thoroughly disparaged by commentators." *Hansen*, ¶ 35 (citations omitted). As for the *res gestae* doctrine, we observed, *inter alia*, that "[t]he phrase is too vague and, therefore, it has been disparaged by judges and commentators alike." *Hansen*, ¶ 78 (citation omitted). Ultimately, we urged the practicing bar and the trial courts to avoid using these doctrines in future cases, and to instead utilize clearer and more precise statements of law. *Hansen*, ¶ 96. Here, although Buck's trial occurred nearly four years after our decision in *Hansen*, the prosecutor raised the *corpus delicti* doctrine during the proceedings. Again, we urge the practicing bar to take note of *Hansen*. Further, in accordance with *Hansen*, we must state that our reliance on the above cited cases does not extend to the concepts of *corpus delicti* and *res gestae* expressed therein.

¶84    **3. Did the District Court err in denying Buck's request for funds to employ a jury consultant and submit supplemental juror questionnaires?**

¶85    In March of 2003, Buck filed his "Motion for Expenditure of County Funds for Employment of a Jury Consultant and for Use of Supplemental Juror Questionnaires." In his brief supporting this Motion, Buck noted the publicity that his case had generated and stated

38

that Evans was well known in the community. Buck also asserted "[t]his case is a complicated case with potentially extreme penalties to the Defendant being a very real possibility and additional resources are necessary." However, Buck cited no legal authority in his arguments. After the State filed a memorandum opposing Buck's request, the District Court denied the Motion. In doing so, the court reasoned, without citation to legal authority, "[t]his is not a death penalty case, nor are the issues to be resolved by the jury unduly complex." The District Court also stated "defense counsel is an experienced trial attorney and is more than capable of using voir dire . . . and the presently used questionnaires to obtain a competent, qualified, and unbiased jury to hear and decide this case without the necessity of a jury consultant or supplemental questionnaires."

¶86 Buck then filed an Application for Writ of Supervisory Control with this Court, asking that we direct the District Court to grant the Motion along with three other pre-trial motions. While we ordered the State to respond regarding one of the issues Buck raised, we declined to grant the Application with regard to the Motion at issue here. Buck also filed a Motion for Reconsideration with the District Court. The court did not rule on that Motion.

¶87 On appeal, Buck argues that the District Court's denial of this Motion "violated his right to a fair trial as guaranteed by [the] *Sixth Amendment* to the U.S. Constitution and Article II, § 24 of the Montana Constitution." Buck notes that the prosecutor was assisted during voir dire by two detectives from the Kalispell Police Department, as well as an assistant from the Flathead County Attorney's Office. Pursuant to this observation, Buck

argues that the prejudice he suffered was "extremely obvious" because "the number of people assisting the prosecutor in voir dire were unlimited."

¶88   We will not address these arguments because Buck does not provide any analysis to support his assertions, nor does he provide citation to legal authority, as is required by Rule 23(a)(4), M.R.App.P. *Lynch*, ¶ 14. As we have stated, this Court is not obligated to conduct legal research on an appellant's behalf or develop legal analysis that may lend support to his or her position. *Zakovi*, ¶ 28 (citing *Johansen*, ¶ 24).

¶89   **4. Did the District Court err in granting the State's Motion *in Limine* regarding hearsay?**

¶90   At trial, Buck intended to introduce some of his own statements made subsequent to Evans' death--his statement that he tried to stop the flow of Evans' blood with a sock, and his statement that "Evans was alive [when Buck left the residence], was yelling and screaming and cussing at him, and that he checked to determine that Evans was alive." Buck made these statements to Nasset, Burns, Jonathan Keys, and Joel Kelley, and intended to introduce the statements through the testimony of these four individuals.

¶91   On the second day of trial, the State filed its "Motion in Limine RE: Hearsay" seeking to prohibit Buck from introducing these and other exculpatory statements during cross-examination of the State's witnesses. The State argued that these statements were inadmissible hearsay, citing Rules 801 and 804, M.R.Evid. That same day, the District Court heard arguments in chambers and granted the State's Motion. Buck subsequently filed two memoranda in opposition to the State's Motion, which were unavailing.

¶92 On appeal, Buck does not challenge the evidentiary basis on which the District Court granted the State's Motion. He presents no arguments regarding the Montana Rules of Evidence. Rather, Buck argues that because of the court's decision, he would have had to relinquish his constitutional right not to testify at trial in order to exercise his "constitutional right to present a defense." In support of this argument, Buck cites *State v. Gordon Bailey* (1982), 201 Mont. 473, 655 P.2d 494, for the proposition that a defendant must not be forced to surrender one constitutional right in order to assert another. *Gordon Bailey*, 201 Mont. at 480, 655 P.2d at 498 (citing *Simmons v. United States* (1968), 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247). Buck also argues that the court's decision precluded him from demonstrating the "bias of the Kalispell Police Department in eliminating all other suspects . . . ."

¶93 The authority to grant or deny a motion *in limine* rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties. *State v. Krause*, 2002 MT 63, ¶ 32, 309 Mont. 174, ¶ 32, 44 P.3d 493, ¶ 32 (quoting *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 15, 289 Mont. 1, ¶ 15, 961 P.2d 75, ¶ 15). Therefore, we will not overturn a district court's grant or denial of a motion *in limine* absent an abuse of discretion. *Krause*, ¶ 32 (citing *Hulse*, ¶ 15). It is well settled that a district court's decision is presumed correct and an appellant bears the burden of establishing error. *Aakre*, ¶ 43 (citing *In re M.J.W.*, ¶ 18). Error cannot be established in the absence of legal authority. *State v. James Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, ¶ 26, 87

P.3d 1032, ¶ 26 (citing *State v. Clausell*, 2001 MT 62, ¶ 48, 305 Mont. 1, ¶ 48, 22 P.3d 1111, ¶ 48).

¶94    First, we reject Buck's constitutional argument. While Buck cites the general rule that a defendant must not be forced to surrender one constitutional right in order to assert another, *Gordon Bailey*, 201 Mont. at 480, 655 P.2d at 498 (citing *Simmons*, 390 U.S. at 394, 88 S.Ct. at 976), he then simply asserts that he was precluded from exercising two constitutional rights simultaneously. He presents no analysis beyond this assertion, and fails to provide authority for the premise that he could not adequately present his defense without introducing his own mitigating statements through the testimony of others. Thus, this conclusory argument fails to establish that the District Court abused its discretion.

¶95    Similarly, we reject Buck's argument that he was precluded from demonstrating "bias" on the part of the Kalispell Police Department. This conclusory assertion, without supporting analysis or legal authority, is insufficient to establish an abuse of discretion by the District Court. Moreover, we note that Buck's counsel did, in fact, question Burns and Nasset regarding the process by which they eliminated other suspects.

¶96    **5. Did the District Court err in denying Buck's Motion for Change of Venue and his related "Motion for Expenditure of County Funds to Conduct a Public Opinion Survey"?**

¶97    In March of 2003, Buck filed a Motion for Change of Venue. Buck then requested that he be allowed to withdraw this Motion without prejudice, stating that he needed more time to complete a supporting brief. The District Court granted this request. In July of 2003, Buck again filed his Motion for Change of Venue. In his brief supporting this Motion, Buck

identified several newspaper articles regarding Evans' death, and argued "[t]he prejudicial atmosphere existing in this jurisdiction requires a change of venue." At a hearing held on August 1, 2003, the State objected to Buck's request, and the District Court denied the Motion.

¶98 Buck also filed a "Motion for Expenditure of County Funds to Conduct a Public Opinion Survey" in April of 2003, seeking "to determine the attitudes of the public and knowledge of the public about events and publicity surrounding the death of George Evans . . . ." In his brief supporting this Motion, Buck argued that local newspaper articles were inflammatory, noting that one article characterized Evans' death as a "brutal homicide," while another indicated that Evans may have been tortured. Buck also asserted that "Evans was popular and well-known throughout the community," citing a newspaper article which reported that between 800 and 900 people attended Evans' memorial service. The State filed a brief opposing Buck's request, arguing "[v]oir dire and a sufficiently large jury pool will enable this Court to seat 12 jurors capable of basing their decision on the evidence presented during trial regardless of Mr. Evans' popularity and the media coverage surrounding his murder." In May of 2003 the District Court denied Buck's Motion.

¶99 Although Buck asks this Court to review of the District Court's denial of his "Motion for Expenditure of County Funds to Conduct a Public Opinion Survey," Buck provides no argument as to how the court may have erred. Thus, we will not address the issue. *See Gollehon v. State*, 1999 MT 210, ¶ 10, 296 Mont. 6, ¶ 10, 986 P.2d 395, ¶ 10 (citing *State ex rel. Booth v. Montana Twenty First Judicial Dist.*, 1998 MT 344, ¶ 35, 292 Mont. 371, ¶ 35,

43

972 P.2d 325, ¶ 35).  As we have stated, this Court is not obligated to conduct legal research on an appellant's behalf or develop legal analysis that may lend support to his or her position. *Zakovi*, ¶ 28 (citing *Johansen*, ¶ 24).

¶100   As for the District Court's denial of his Motion for Change of Venue, Buck argues that "[p]re-trial publicity in this case made a fair trial in Flathead County an impossibility." In support of this argument, Buck states "Flathead County's local newspaper with the greatest circulation, The Daily Interlake, published a number of articles about the death of George Evans.  One article described the killing as possibly involving torture."  Buck also states that he "continues in his position that a fair and impartial jury could not be found in Flathead County."  Upon these contentions, Buck seeks "a new trial in a different county to avoid the effect of adverse and prejudicial publicity."  We will not address Buck's argument because he does not support it with any analysis or citation to legal authority, as is required by Rule 23(a)(4), M.R.App.P.  *Lynch*, ¶ 14.

¶101   **6.  Did the District Court err in denying Buck's "Motion for Expenditure of County Funds for Employment of a Medical Expert"?**

¶102   Buck indicated at the omnibus hearing that he would rely on the defense that he "did not have a particular state of mind that is an essential element of the offense charged."  In December of 2002, Buck filed his "Motion for Expenditure of County Funds for a Psychiatric Evaluation."  Relying on § 46-14-202, MCA, Buck sought an order authorizing the expenditure of funds to employ Dr. Joseph D. Rich to perform the psychiatric examination of Buck.  Specifically, Buck sought Dr. Rich's opinion "as to the capacity of the Defendant to have a particular state of mind that is an element of the offense charged," and "as to the

44

capacity of the Defendant, because of the mental disease or defect, to appreciate the criminality of the Defendant's behavior or to conform the Defendant's behavior to the requirement of the law." The District Court granted Buck's Motion four days after it was filed.

¶103 In March of 2003, Buck filed his "Motion for Expenditure of County Funds for Employment of a Medical Expert." The Motion stated "Defendant . . . suffers from Type I diabetes and an expert is required to inform the trier of fact of the effects of blood sugar on a person's ability to form a particular state of mind and to appreciate the consequences of his or her actions." However, the Motion contained no citation to legal authority and it was not supported by a brief.

¶104 The State filed a memorandum in opposition to this Motion. In doing so, the State conceded that "a defendant is entitled to the assistance of an expert when necessary for a fair trial," but also argued that Buck had failed to demonstrate why a second expert was necessary to assess his mental state at the time of the charged offenses. The State also argued that Buck had failed to show that diabetes could affect a person's ability to form a particular state of mind and to appreciate the consequences of his actions. Buck provided no response to the State's arguments.

¶105 The District Court denied Buck's Motion, stating:

> By Order entered December 24, 2002, the Court granted the December 20, 2002, Motion appointing Dr. Rich as specifically requested by Defendant. Now, without any evidence of dissatisfaction with such appointment, nor any showing either as to why a second expert is necessary to conduct another like examination or as to why a diabetologist is better qualified to do so than a psychiatrist with considerable experience in forensic psychiatry, Defendant has

45

filed the instant Motion. Based on the foregoing, the Motion should be denied. Buck then filed an Application for Writ of Supervisory Control with this Court, asking that we direct the District Court to grant the Motion along with three other pre-trial motions. While we ordered the State to respond regarding one of the issues Buck raised, we declined to grant the Application with regard to Buck's Motion for a medical expert. Buck also filed a Motion for Reconsideration with the District Court. The court did not rule on that motion.

¶106 On appeal Buck argues, without citation to authority, that he "required the services of a medical expert, particularly a diabetologist to present to the jury evidence that he did not possess the mental state requisite to a conviction of either deliberate homicide or burglary." In support of this argument, Buck asserts that he "would have presented evidence of extremely low blood sugar" which caused him "to have the inability to form the state of mind required f[o]r him to have acted either purposely or knowingly."

¶107 The authority to grant or deny a motion *in limine* rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties. *Krause*, ¶ 32 (quoting *Hulse*, ¶ 15). Therefore, we will not overturn a district court's grant or denial of a motion *in limine* absent an abuse of discretion. *Krause*, ¶ 32 (citing *Hulse*, ¶ 15).

¶108 It is well settled that a district court's decision is presumed correct and an appellant bears the burden of establishing error. *Aakre*, ¶ 43 (citing *In re M.J.W.*, ¶ 18). Error cannot be established in the absence of legal authority. *James Bailey*, ¶ 26 (citing *Clausell*, ¶ 48). Buck has not met that burden here. We conclude Buck's cursory arguments do not establish

46

that the District Court abused its discretion. Our conclusion is based on the record and the arguments presented here, however, and it must not be interpreted as a general holding that a diabetic defendant is not entitled to the services of a medical expert in his or her defense.

¶109 Buck also argues that when the District Court denied his Motion, it precluded him from "presenting any evidence that he did not have the requisite state of mind called for by the statute charging the offense of deliberate homicide." Thus, Buck asserts, he was forced to choose between his right to due process and his right not to testify at trial, because the "only remaining avenue to present evidence of his state of mind was through his own testimony." In support of this argument, Buck cites *Gordon Bailey*, for the proposition that a defendant must not be forced to surrender one constitutional right in order to assert another. *Gordon Bailey*, 201 Mont. at 480, 655 P.2d at 498 (citing *Simmons*, 390 U.S. at 394, 88 S.Ct. at 976). We do not address this argument because Buck did not raise it in his initial Motion or in his Motion for Reconsideration. It is well established that this Court will not address an issue raised for the first time on appeal, or a party's change in legal theory. *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16 (quoting *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15).

¶110 **7. Did the District Court err in limiting the testimony of Buck's expert witness, Dean Wideman?**

¶111 In April of 2003, Buck filed his "Motion for Expenditure of County Funds for a Criminologist and Forensic Scientist." With this Motion, Buck sought funds to employ Dean Wideman (Wideman), a forensic scientist, stating "such an expert is required to examine all evidence, including DNA and blood samplings, laboratory reports, photographs, etc." The

State filed a memorandum opposing Buck's request, arguing that Buck had failed to show a necessity for Wideman's services. The District Court accepted the State's argument and entered an Order denying Buck's Motion.

¶112 On May 14, Buck filed a Motion for Reconsideration, together with a supporting memorandum, claiming that the District Court's denial of the Motion violated his right of confrontation guaranteed by the United States Constitution and the Montana Constitution, as well as his right to due process under the Montana Constitution. In supporting these claims, Buck asserted his belief that "the evidence" had been tainted by "improper evidence-gathering techniques" and stated that he needed expert assistance to mount an appropriate challenge to this unspecified evidence. That same day, Buck filed his Application for Writ of Supervisory Control with this Court, asking that we direct the District Court to grant the Motion along with three other pre-trial motions. The next day, the State withdrew its objection to Buck's Motion seeking funds to employ Wideman.

¶113 On May 19, this Court entered an Order whereby we declined to further consider Buck's arguments regarding the other three pre-trial motions. However, as for Buck's request to employ Wideman, we granted the State twenty days to file a response, and stayed further proceedings in the District Court. On May 21, the District Court held a hearing wherein Buck stated that he would move for dismissal of his Application for Writ of Supervisory Control. The District Court then indicated that Buck's request for funds to employ Wideman would be granted upon formal dismissal of the Application. At Buck's

48

request, this Court dismissed his Application for Writ of Supervisory Control. Then, on May 23, the District Court granted Buck's request for funds to employ Wideman.

¶114 During Buck's trial, on August 13, the State filed a Motion seeking to limit Wideman's testimony. The State asserted that it had received Wideman's Preliminary Report on August 7, but nothing further. Consequently, the State requested "an order limiting Mr. Wideman's testimony to the material and opinions he expresses in his August 7th report." On the last day of trial, before Wideman testified, the District Court discussed this Motion with counsel in chambers. At that time, Buck's counsel indicated that Wideman's testimony would be limited to the material contained in his Preliminary Report. The District Court did not enter a formal ruling on the State's Motion.

¶115 In his testimony, Wideman identified what he perceived as problems with the investigative techniques used at the crime scene, including a "lack of documentation" and a failure to submit enough items for DNA analysis. The State only objected once during this testimony, after Buck's counsel asked Wideman whether the DNA methodology used in the investigation was proper. This objection was apparently overruled during a sidebar conference, as Buck's counsel subsequently proceeded to ask the same question without an objection from the State.

¶116 On appeal Buck asserts that the District Court limited Wideman's testimony to the material contained in his Preliminary Report. This limitation, Buck argues, violated his right of confrontation guaranteed by the United States Constitution and the Montana Constitution.

49

¶117 It is well established that in order to preserve an issue for this Court's consideration on appeal, a defendant generally must raise an objection in the proceedings below. Sections 46-20-104(2) and 46-20-701, MCA; *State v. White Clay*, 1998 MT 244, ¶ 24, 291 Mont. 147, ¶ 24, 967 P.2d 370, ¶ 24. Additionally, we have stated that this Court will not hold a district court in error for an action in which the appealing party acquiesced or actively participated. *White Clay*, ¶ 24 (citing *Matter of R.B.O.* (1996), 277 Mont. 272, 283, 921 P.2d 268, 275). Here, although the District Court did not formally rule on the State's Motion seeking to limit Wideman's testimony, it did indicate that Wideman's testimony would be limited to the material contained in his Preliminary Report. At the same time, however, Buck's counsel agreed with this limitation. The following colloquy occurred in chambers:

| Mr. Corrigan: | . . . [Buck's counsel] provided me with a preliminary report from Mr. Wideman last Thursday afternoon. I have not received anything since that date, and for that reason would ask this Court to issue an order limiting Mr. Wideman's testimony to the matters contained within that preliminary report. |
|---|---|
| The Court: | Okay, Mark? |
| Mr. Sullivan: | Your Honor, the main thrust of Mr. Wideman's testimony is expected to be on investigative techniques, how he was -- how they are properly conducted based on his experience and training, which is extensive. |
| . . . . | |
| Mr. Sullivan: | So there really shouldn't be any surprises in the area he's going to be testifying. |
| The Court: | *But his testimony . . . as I gather, is in line with what is provided in this preliminary report. His testimony is going to be with respect to his observations about the investigation at the scene, right?* |
| Mr. Sullivan: | *Yes*, sir, he will be testifying about his observations based on -- and his training and qualifications of course, he will be giving an opinion as an expert. He's entitled to do that. |

| | |
|---|---|
| Mr. Corrigan: | With respect to what he's talking about here, I'm not sure what Mark is referring to about his training. His training is an open door. To the extent of blood spatter analysis or DNA analysis or a discussion on the merits of this case outside the parameters of his preliminary report -- |
| The Court: | *That's not what you're talking about, right?* |
| Mr. Sullivan: | *I don't believe I am, Judge.* |
| The Court: | *Well, if it gets there it will stop.* |
| . . . . | |
| The Court: | . . . [I]f he's going to stay within the parameters of discussion of his critique, if you will, of the crime scene investigation -- that's what you intend to do? |
| Mr. Sullivan: | That is my expectation. |

(Emphasis added.) The record shows that Buck essentially acquiesced to the State's Motion. Because he did not object when the District Court indicated that Wideman's testimony would be confined to the material contained in his Preliminary Report, Buck waived his right to raise this issue on appeal. *White Clay*, ¶ 24. Accordingly, we will not address the cursory constitutional argument Buck raises on appeal. *White Clay*, ¶ 24.

## CONCLUSION

¶118 Buck has failed to demonstrate that any reversible error occurred in the proceedings below.

¶119 Affirmed.

/S/ JAMES C. NELSON

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS

51

/S/ PATRICIA COTTER